# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

### 2025 ND 199

| | |
|---|---|
| Access Independent Health Services, Inc., d/b/a Red River Women's Clinic, on behalf of itself and its patients; Kathryn L. Eggleston M.D., on behalf of herself and her patients; Ana Tobiasz, M.D. on behalf of herself and her patients; Erica Hofland, M.D. on behalf of herself and her patients; Collette Lessard, M.D. on behalf of herself and her patients, | Plaintiffs and Appellees |
| v. | |
| Drew H. Wrigley, in his official capacity as Attorney General for the State of North Dakota; | Defendant and Appellant |
| and | |
| Kimberlee Jo Hegvik, in her official capacity as the State's Attorney for Cass County; Julie Lawyer, in her official capacity as the State's Attorney for Burleigh County; Amanda Engelstad, in her official capacity as State's Attorney for Stark County; and Haley Wamstad, in her official capacity as the State's Attorney for Grand Forks County, | Defendants |

### No. 20240291

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable Bruce A. Romanick, Judge.

REVERSED.

Per Curiam.

Meetra Mehdizadeh (argued), New York, NY, and Zhuya B. Lu (appeared), Washington, D.C., and Christina A. Sambor (appeared), Bismarck, ND, for plaintiffs and appellees.

Philip J. Axt, Solicitor General (argued) and Courtney R. Titus, Assistant Attorney General (on brief), Bismarck, ND, and Daniel L. Gaustad (appeared), Joseph E. Quinn and Marcus C. Skonieczny (on brief), Special Assistant Attorneys General, Grand Forks, ND, for defendant and appellant.

Christopher T. Dodson, Bismarck, ND, for amicus curiae North Dakota Catholic Conference.

Bradley N. Wiederholt, Bismarck, ND, and April S. Wood, Bryan, TX, for amicus curiae 40 Days for Life.

Zachary Tomczik, Grand Forks, ND, and Elizabeth B. Wydra, Brianne J. Gorod, David H. Gans, Miriam Becker-Cohen, Nargis Aslami, Washington, D.C., for amicus curiae Constitutional Accountability Center.

Kylie Oversen, Fargo, ND, and Molly A. Meegan, Carrie Flaxman and Alethea A. Swift, Washington, D.C., for amicus curiae The American College of Obstetricians and Gynecologists, Society for Maternal-Fetal Medicine, and Society of Family Planning.

Joel M. Fremstad, Fargo, ND, and Jayme Jonat and Monica L. Coscia, New York, NY, amicus curiae Medical Students for Choice.

Dane DeKrey, Moorhead, MN, for amicus curiae Eileen McDonagh, Linda McClain and James Fleming.

**Per curiam.**

[¶1]   "[T]he supreme court shall not declare a legislative enactment unconstitutional unless at least four of the members of the court so decide." N.D. Const. art. VI, § 4. Justice Crothers, joined by Justice McEvers and District Judge Narum, concluded N.D.C.C. ch. 12.1-19.1 is unconstitutionally vague under article I, § 12 of the North Dakota Constitution. Justice Tufte, joined by Chief Justice Jensen, concluded N.D.C.C. ch. 12.1-19.1 is not unconstitutional under either article I, § 1 or article I, § 12 of the North Dakota Constitution. The effect of the separate opinions in this case is that N.D.C.C. ch. 12.1-19.1 is not declared unconstitutional by a sufficient majority and that the district court judgment declaring N.D.C.C. ch. 12.1-19.1 unconstitutional and void is reversed. *See MKB Mgmt. Corp v. Burdick*, 2014 ND 197, ¶ 1, 855 N.W.2d 31 (judgment enjoining enforcement of law reversed after the Court did not reach a sufficient majority to declare the law unconstitutional).

[¶2]   Jon J. Jensen, C.J.
       Daniel J. Crothers
       Lisa Fair McEvers
       Jerod E. Tufte
       Daniel D. Narum, D.J.

[¶3]   The Honorable Daniel D. Narum, D.J., sitting in place of Bahr, J., disqualified.

**Crothers, Justice.**

[¶4]   The State appeals from a judgment declaring N.D.C.C. ch. 12.1-19.1 violates the North Dakota Constitution. The district court did not err when it decided the law, which criminalizes abortion with exceptions, is unconstitutionally vague. The vagueness in the law relates to when an abortion can be performed to preserve the life and health of the mother. After striking this invalid provision, the remaining portions of the law would be inoperable.

Because the unconstitutional part of the law cannot be severed from the rest, N.D.C.C. ch. 12.1-19.1 would be invalid in its entirety. We would affirm the district court's judgment on these grounds only and decline to address the remaining questions.

I

[¶5] The Plaintiffs are a healthcare clinic and doctors who provide medical care that includes aborting pregnancies. It is undisputed that pregnancy has the potential to jeopardize the safety of the mother and an abortion may be necessary to preserve her life and health under some circumstances. It is also undisputed that the plaintiff-physicians have the training and licensure necessary to provide medical care in this context.

[¶6] Dr. Jerry Obritsch, an obstetrician and one of the State's expert witnesses, provided undisputed testimony about various health conditions expectant mothers in North Dakota experience. These clinical (not hypothetical) experiences include preterm premature rupture of membranes (PPROM); ascending chorioamnionitis; gestational diabetes; maternal hypertension; preeclampsia; hemolysis, elevated liver enzymes, and low platelets (HELLP syndrome); placenta previa; factor V Leiden; and hyperemesis gravidarum. Dr. Obritsch noted other conditions may preexist the pregnancy and complicate it, including cancer, kidney disease, and lupus. He explained these conditions all increase expectant mothers' risk of mortality. Among other symptoms, he testified these conditions may affect the functioning of the mother's organs and cause hemorrhaging, blood clots and seizures. For example, he described ascending chorioamnionitis, a complication of PPROM, as:

> [A]n ascending infection when the amniotic membranes are released and as a result, there's a direct communication between the vagina and the uterus. And the vagina, just like our skin, has millions of bacteria, and they ascend into the intrauterine cavity and cause a significant infection to occur, which then can cross into the blood stream, causing maternal sepsis and death.

Dr. Obritsch noted this was an infection that can develop quickly, "[w]ithin hours to days."

2

[¶7]    Dr. Obritsch testified that it may be difficult to predict whether, and to what extent, an expectant mother's life and health is in jeopardy. For example, placenta previa is a condition where the placenta attaches low in the uterus. The condition can result in severe bleeding. Accurately determining if and when life-threatening bleeding will occur is difficult. Dr. Obritsch explained:

Q. . . . Can you diagnose the likelihood of torrential hemorrhage as a result of placental previa before it happens?

A. Generally not. The patient may present with some vaginal spotting, but typically that's the only warning that we have regarding placenta previa abrupting, moving away, separating, with torrential onset of hemorrhage.

Q. And between the diagnosis of placenta previa and torrential hemorrhage, how much time usually passes?

A. Minutes to hours to days to weeks.

Q. Is there any way to predict how much time will elapse between a patient that's diagnosed with placenta previa and torrential hemorrhage?

A. There is not.

Q. And what are the consequences of torrential hemorrhage?

A. Maternal death.

Q. Are there situations where torrential hemorrhage does not result in maternal death?

A. Yes. With emergency surgical intervention, the mother's life can be saved.

Q. And how quickly does that emergency surgical intervention need to be offered for a patient suffering from torrential hemorrhage?

A. ASAP. This is an obstetrical emergency that time is of the essence when a torrential hemorrhage occurs. As soon as possible.

Q. And how soon, generally? . . .

A. Minutes. Minutes. Minutes. Absolute minutes. Because the mother can literally bleed to death.

[¶8]    Consistent with Dr. Obritsch's testimony, this Court has acknowledged the "grave risks to health" pregnant patients face. *See Wrigley v. Romanick*, 2023 ND 50, ¶ 31, 988 N.W.2d 231 (*Wrigley I*). We explained the "severe complications" expectant mothers "routinely" present with at emergency rooms:

> The patient might be spiking a fever, experiencing uterine cramping and chills, contractions, shortness of breath, or significant vaginal bleeding. The ER physician may diagnose her with, among other possibilities, traumatic placental abruption, preeclampsia, or a preterm premature rupture of the membranes. In those situations, the physician may be called upon to make complex, difficult decisions in a fast-moving, chaotic environment. She may conclude that the only way to prevent serious harm to the patient or save her life is to terminate the pregnancy—a devastating result for the doctor and the patient.
>
> . . . .
>
> Yet if the physician does not perform the abortion, the pregnant patient faces grave risks to her health—such as severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, hypoxic brain injury, or even death. And this woman, if she lives, potentially may have to live the remainder of her life with significant disabilities and chronic medical conditions as a result of her pregnancy complication.

*Id.* (quoting *United States v. Idaho*, 623 F. Supp. 3d 1096, 1101 (D. Idaho 2022)).

A

[¶9]    The North Dakota legislature enacted N.D.C.C. ch. 12.1-19.1 after we denied a writ to vacate the district court's preliminary injunction of an earlier abortion regulation. *See Wrigley I*, 2023 ND 50. The Plaintiffs, on behalf of

themselves and their patients, filed an amended complaint challenging the constitutionality of N.D.C.C. ch. 12.1-19.1, which provides in full:

**CHAPTER 12.1-19.1**
**ABORTION**

**12.1-19.1-01. Definitions.**

As used in this chapter:

1.  "Abortion" means the act of using, selling, or prescribing any instrument, medicine, drug, or any other substance, device, or means with the intent to terminate the clinically diagnosable pregnancy of a woman, including the elimination of one or more unborn children in a multifetal pregnancy, with knowledge the termination by those means will with reasonable likelihood cause the death of the unborn child. The use, sale, prescription, or means is not an abortion if done with the intent to:
    a.  Remove a dead unborn child caused by spontaneous abortion;
    b.  Treat a woman for an ectopic pregnancy; or
    c.  Treat a woman for a molar pregnancy.

2.  "Physician" means an individual licensed to practice medicine or osteopathy under chapter 43-17 or a physician who practices in the armed services of the United States or in the employ of the United States.

3.  "Probable gestational age of the unborn child" means what, in reasonable medical judgment, will with reasonable probability be the gestational age of the unborn child.

4.  "Reasonable medical judgment" means a medical judgment that would be made by a reasonably prudent physician who is knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved.

5.  "Serious health risk" means a condition that, in reasonable medical judgment, complicates the medical condition of the

pregnant woman so that it necessitates an abortion to prevent substantial physical impairment of a major bodily function, not including any psychological or emotional condition. The term may not be based on a claim or diagnosis that the woman will engage in conduct that will result in her death or in substantial physical impairment of a major bodily function.

**12.1-19.1-02. Abortion prohibited – Penalty.**

It is a class C felony for a person, other than the pregnant female upon whom the abortion was performed, to perform an abortion.

**12.1-19.1-03. Exceptions.**

This chapter does not apply to:

1.  An abortion deemed necessary based on reasonable medical judgment which was intended to prevent the death or a serious health risk to the pregnant female.

2.  An abortion to terminate a pregnancy that based on reasonable medical judgment resulted from gross sexual imposition, sexual imposition, sexual abuse of a ward, or incest, as those offenses are defined in chapter 12.1-20, if the probable gestational age of the unborn child is six weeks or less.

3.  An individual assisting in performing an abortion if the individual was acting within the scope of that individual's regulated profession, was under the direction of or at the direction of a physician, and did not know the physician was performing an abortion in violation of this chapter.

B

[¶10]   The Plaintiffs brought two claims. The first is that N.D.C.C. ch. 12.1-19.1 violates the physicians' right to due process under N.D. Const. art. I, § 12 because it is unconstitutionally vague. Article I, § 12, prohibits the government from depriving any person "of life, liberty, or property without due process of law." Among other assertions, the Plaintiffs allege the statute infringed their right to

6

due process when it was enacted by failing to use language sufficient to provide notice of when they may perform an abortion to protect their patients' health. They argue this unclear language, coupled with the law's felony penalties for non-compliance, deters the provision of constitutionally protected medical care.

[¶11]   The Plaintiffs' second claim alleges the law violates pregnant women's right to life and health preserving care under N.D. Const. art. I, § 1, which states:

> All individuals are by nature equally free and independent and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property and reputation; pursuing and obtaining safety and happiness; and to keep and bear arms for the defense of their person, family, property, and the state, and for lawful hunting, recreational, and other lawful purposes, which shall not be infringed.

The Plaintiffs claim this constitutional provision guarantees the right to an abortion under various circumstances, including contexts relating to mental health conditions and when a pregnancy will not create sustainable life after birth.

[¶12]   The State moved for summary judgment. The Plaintiffs opposed the motion arguing there were unresolved issues of fact and the case should proceed to trial. The district court issued an order for summary judgment in favor of the Plaintiffs. The court decided the law was unconstitutionally vague, explaining:

> On its face, before even considering potential as-applied challenges, the law is confusing and vague. As written, it can have a profound chilling effect on the willingness of physicians to perform abortions, even where the North Dakota Supreme Court has already said there is a fundamental right to do so to preserve a woman's life or health.
>
> . . . .
>
> The Court concludes the law is impermissibly vague on its face, and as currently written it threatens to inhibit the exercise of constitutionally protected rights for both North Dakota physicians and North Dakota patients.

7

The court also decided the law violated the rights of pregnant women under N.D. Const. art. I, § 1. The court entered judgment stating:

> a. The abortion statutes at issue in this case infringe on a woman's fundamental right to procreative autonomy, and are not narrowly tailored to promote women's health or to protect unborn human life. The law as currently drafted takes away a woman's fundamental rights to liberty and her fundamental right to pursue and obtain safety and happiness. The law also impermissibly infringes on the constitutional rights for victims of crimes. Therefore Chapter 12.1-19.1, N.D.C.C. is unconstitutional.
>
> b. The Court concludes Chapter 12.1-19.1, N.D.C.C., violates the Constitution of the State of North Dakota and is void for vagueness and of no effect.

The State appealed and sought a stay from this Court, which was denied in *Access Independent Health Services., Inc. v. Wrigley*, 2025 ND 26, 16 N.W.3d 902 (*Wrigley II*). The merits of the State's appeal now are before us for consideration.

## II

[¶13] Resolution of the appeal turns on a series of questions. First, do we have a standard for facial vagueness challenges that preliminarily bars the Plaintiffs' claim? If not, does the legislation contain unconstitutional vagueness? And if it does, can the vague parts of the law be severed from the rest? We take each of these questions in turn, but first set out our well established standard for reviewing appeals of summary judgment:

> Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the

8

benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

*Higgins v. Lund*, 2025 ND 47, ¶ 28, 17 N.W.3d 828 (quoting *Johnson v. Shield*, 2015 ND 200, ¶ 6, 868 N.W.2d 368). In resolving the issues here under the summary judgment posture and standard, we rely only on facts as presented by the State or its expert witnesses.

## III

[¶14]   The government may not deprive any person of life, liberty, or property without due process of law. N.D. Const. art. I, § 12. The principle that a vague law is void flows from this due process guarantee. *Interest of D.D.*, 2018 ND 201, ¶ 7, 916 N.W.2d 765. A law is vague if it fails to give fair warning or allows for discriminatory enforcement. *City of Fargo v. Roehrich*, 2021 ND 145, ¶ 6, 963 N.W.2d 248. "Vague laws may trap the innocent because they fail to provide adequate warning of what conduct is prohibited, and they may result in arbitrary and discriminatory application because a vague law delegates basic policy matters to those who apply the law, allowing the law to be applied on an ad hoc and subjective basis." *State v. Holbach*, 2009 ND 37, ¶ 24, 763 N.W.2d 761.

[¶15]   To survive a vagueness challenge, laws require a degree of specificity:

A law is not unconstitutionally vague if: (1) the law creates minimum guidelines for the reasonable police officer, judge, or jury charged with enforcing the law, and (2) the law provides a reasonable person with adequate and fair warning of the prohibited conduct. A law is not unconstitutionally vague if the challenged language, when measured by common understanding and practice, gives adequate warning of the conduct proscribed and marks boundaries sufficiently distinct for fair administration of the law.

9

*State v. Moses*, 2022 ND 208, ¶ 17, 982 N.W.2d 321 (cleaned up). The amount of specificity required depends on the scope of the law and the type of conduct at issue. *Olson v. City of West Fargo*, 305 N.W.2d 821, 829 (N.D. 1981); *see also Texas Dep't of Ins. v. Stonewater Roofing, Ltd. Co.*, 696 S.W.3d 646, 660 (Tex. 2024) (stating the degree of vagueness that will be tolerated "depends in part on the nature of the enactment"); *Bartlow v. Costigan*, 13 N.E.3d 1216, 1225 (Ill. 2014) (stating the "test for determining vagueness varies with the nature and context of the legislative enactment"). We agree with the Colorado Supreme Court when it explained:

> [T]he strictness of the vagueness test depends on whether the challenged law threatens to inhibit the exercise of constitutionally protected rights. When such constitutionally protected behavior may be inhibited, a greater degree of specificity is required than when a law does not implicate constitutionally protected liberties.

*Robertson v. City & County of Denver*, 874 P.2d 325, 334 (Colo. 1994) (en banc) (citations omitted); *see also Colautti v. Franklin*, 439 U.S. 379, 391 (1979) (stating the principle that vague laws are void is "especially true where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights").

[¶16]   The severity of a law's punishment also affects the degree of specificity required. Less specificity is constitutionally permitted when a statute imposes civil penalties, *Stonewater Roofing*, 696 S.W.3d at 661, while more specificity is required when a statute imposes criminal penalties, *Bartlow*, 13 N.E.3d at 1225. *See also Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (stating "'if criminal penalties may be imposed for violations of a law, a stricter standard is applied in reviewing the statute for vagueness'") (quoting *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272-73 (4th Cir. 2019)); *State v. Cobb*, 969 P.2d 244, 247 (Idaho 1998) (stating vagueness challenges are "more favorably acknowledged and a more stringent vagueness test will be applied where a statute imposes a criminal penalty").

## IV

[¶17] The State argues that allowing the Plaintiffs to bring their facial vagueness claim "would be a significant change to how this Court has long adjudicated facial vagueness challenges" amounting to an "abortion-related distortion" of the Court's jurisprudence. The State asserts, "Outside of the First Amendment, vagueness challenges are generally only appropriate on an as-applied basis, because to facially strike down a statute for any other type of claim there must not be a single instance where the statute can provide an understandable core of conduct." The State argues that N.D.C.C. ch. 12.1-19.1 cannot be facially vague because "there are numerous scenarios" where the law would clearly allow abortions, "such as where the patient is suffering from hemorrhaging," and there are "also clearly scenarios where performing an abortion would not be permissible" such as when there are "no medical complications at all."

## A

[¶18] The distinction between an as-applied challenge and a facial challenge relates to the breadth of the requested relief. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). An as-applied challenge seeks relatively narrow relief in the form of a declaration that a law is "unconstitutional in a particular case." *SCS Carbon Transp. LLC v. Malloy*, 2024 ND 109, ¶ 8, 7 N.W.3d 268. A facial challenge asks the court to provide the broader remedy of declaring the legislature "exceeded a constitutional limitation" when it enacted a law. *Sorum v. State*, 2020 ND 175, ¶ 21, 947 N.W.2d 382. The result of a declaration that a law is facially unconstitutional is to treat the law "as if it were never enacted." *Id.* The difference between facial and as-applied challenges is "not so well defined that it has some automatic effect." *Citizens United*, at 331. Regardless of the type of claim at issue, we decide constitutional questions on the narrowest grounds possible. *SCS Carbon Transp.*, ¶ 7.

[¶19] Both this Court and the United States Supreme Court have issued decisions refining the burden required to successfully mount a facial challenge. *See generally Northwest Landowners Assoc. v. State*, 2022 ND 150, ¶ 14, 978 N.W.2d 679. In earlier cases this Court applied a rule requiring "the challenger to

11

establish that no set of circumstances exists under which the statute would be valid." *Larimore Pub. School Dist. No. 44 v. Aamodt*, 2018 ND 71, ¶ 38, 908 N.W.2d 442. This rule had origins in federal jurisprudence, and in the context of facial vagueness challenges specifically, a leading case was *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982).

[¶20]  *Hoffman Estates* dealt with a pre-enforcement facial vagueness challenge to a law regulating the sale of drug paraphernalia. 455 U.S. at 491. The Supreme Court explained, "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 499. "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* The Supreme Court noted the regulation in question did not implicate the challengers' First Amendment rights, but it "may nevertheless be challenged on its face as unduly vague, in violation of due process." *Id.* at 497. The Court announced that to succeed the challengers "must demonstrate that the law is impermissibly vague in all of its applications." *Id*. The Court upheld the law noting it "simply regulates business behavior," *id.* at 499, and "is reasonably clear in its application to the complainant." *Id.* at 505. *See also United States v. Salerno*, 481 U.S. 739, 745 (1987) (stating in a different context that a facial challenge "must establish that no set of circumstances exists under which the Act would be valid").

[¶21]  The Supreme Court later distinguished vagueness claims related to constitutionally protected conduct from claims challenging general economic regulations in *City of Chicago v. Morales*, 527 U.S. 41 (1999). The case dealt with a facial vagueness challenge to a law prohibiting gang members from loitering in public places. *Id.* at 45-46. The Supreme Court noted the law did not impair the challengers' First Amendment rights because the loitering restriction "does not prohibit any form of conduct that is apparently intended to convey a message." *Id.* at 53. However, the Court explained the right to move freely in public is a constitutionally protected liberty interest. *Id*. at 53-54. The Court noted that, unlike the economic regulation in *Hoffman Estates*, the criminal loitering ordinance did not regulate business activity, and "[w]hen vagueness permeates the text of such a law, it is subject to facial attack." *Id.* at 55. The Court declared

the law void for vagueness on its face reasoning it "affords too much discretion to the police and too little notice to citizens who wish to use the public streets." *Id.* at 64.

[¶22]   The Second Circuit Court of Appeals analyzed these decisions while addressing the question of whether a facial vagueness challenge could be maintained outside the First Amendment context. *See Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010). The court explained there are "two potential standards that may govern non-First Amendment vagueness challenges." *Id.* at 743.

> The first possible standard for evaluating facial challenges outside of the First Amendment context is that such challenges are permitted only when "no set of circumstances exists under which the law would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987); *accord Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982) ("To succeed in a vagueness challenge, the complainant must demonstrate that the law is impermissibly vague in all of its applications."). This standard effectively eliminates facial challenges outside of the First Amendment context that could not also be brought as an as-applied challenge, since any law that is unconstitutional in every set of circumstances is also necessarily unconstitutional when applied to any plaintiff. . . .

> The second potential standard comes from *Morales*, where the Supreme Court expressed some skepticism about the *Salerno/Hoffman Estates* standard and upheld a facial vagueness challenge to an anti-loitering statute with no First Amendment implications. *See Morales*, 527 U.S. at 55 n. 22, 119 S. Ct. 1849 (Stevens, J., plurality opinion). *Morales* does suggest that facial challenges are permissible outside of the First Amendment context, but that case only permitted such a challenge in the presence of a constitutionally-protected right. *See Morales*, 527 U.S. at 53, 119 S. Ct. 1849 (Stevens, J., plurality opinion) ("The freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause."); *id.* at 55, 119 S. Ct. 1849 (stating that vague criminal laws that lack a *mens rea* requirement and infringe on constitutionally-protected rights are "subject to facial attack"). We

are aware of no court that has read *Morales* so broadly as to permit facial challenges where no constitutional right is implicated.

*Dickerson*, at 743-44 (cleaned up). The court did not decide which standard to apply because the challenger could not meet either. *Id.* at 744 (explaining the plaintiffs' claim "does not implicate any non-First Amendment constitutional right").

[¶23]   In 2015, the Supreme Court expressly addressed the issue in *Johnson v. United States*, 576 U.S. 591 (2015). The question was whether the residual clause of the Armed Career Criminal Act, which does not regulate speech or religion, is unconstitutionally vague. *Id.* at 593. A majority of the Supreme Court joined an opinion authored by Justice Scalia holding that it was. *Id.* at 606. The Supreme Court explained a law need not be vague in every application to violate due process:

> In all events, although statements in some of our opinions could be read to suggest otherwise our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conducting themselves in a manner annoying to persons passing by"—even though spitting in someone's face would surely be annoying.

*Id.* at 602 (cleaned up).[1]

_____

[1] The dissent declares the United States Supreme Court has never decided a law was facially void for vagueness in a pre-enforcement challenge. Tufte, J., dissenting opinion, at ¶ 134. That declaration overlooks *Colautti*, 439 U.S. at 397, where the Supreme Court struck down an abortion regulation subjecting physicians to criminal penalties explaining it "could have a profound chilling effect on the willingness of physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment." The ultimate holding but not the reasoning in *Colautti* was abrogated by *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), due to that decision's overruling of *Roe v. Wade*, 410 U.S. 113 (1973).

[¶24]   We recently took note of the changed federal jurisprudence in *Northwest Landowners*. We acknowledged we previously applied the "no set of circumstances" standard, but explained:

> However, since *Salerno*, other courts have declined to apply that standard to facial challenges. *Utah Pub. Emps. Ass'n v. State*, 2006 UT 9, ¶¶ 20-25, 131 P.3d 208 (rejecting application of *Salerno* in a facial takings challenge and collecting supporting cases). The Supreme Court has also declined to apply *Salerno* in subsequent decisions considering facial challenges. *City of Chicago v. Morales*, 527 U.S. 41, 55, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself.").

2022 ND 150, ¶ 14. Speaking in general terms, we clarified: "No consideration of circumstances is necessary to resolve a facial challenge because the claim is that upon enactment, the legislation has an immediate unconstitutional legal effect." *Id.*; *see also Sorum*, 2020 ND 175, ¶ 21 (explaining a "violation that occurs at the time of enactment does not depend on any facts or circumstances arising later"). Although we rejected the "no set of circumstances" standard in *Northwest Landowners*, the case did not concern a facial vagueness challenge.

B

[¶25]   The present case directly confronts us with the question of whether a plaintiff advancing a facial vagueness challenge to a law implicating a non-First Amendment constitutional right must satisfy the "no set of circumstances" standard. This Court has not directly addressed the issue. Two lines of cases exist in this jurisdiction—one where we have applied the standard and one where we have not.

[¶26]   We collected cases deciding whether laws were void for vagueness on their face without reference to the "no set of circumstances" standard in *Wrigley II*, 2025 ND 26, ¶ 23:

> *See, e.g.*, [*State v.*] *Moses*, 2022 ND 208, ¶ 17, 982 N.W.2d 321 (possession of firearms by felons); *State v. Kordonowy*, 2015 ND 197,

15

¶ 19, 867 N.W.2d 690 (refusal to submit to chemical testing); *Simons v. Dep't of Human Servs.*, 2011 ND 190, ¶ 31, 803 N.W.2d 587 (child abuse); *State v. Brown*, 2009 ND 150, ¶ 35, 771 N.W.2d 267 (dog barking ordinance); *City of Fargo v. Salsman*, 2009 ND 15, ¶ 23, 760 N.W.2d 123 (nuisance); *City of Minot v. Boger*, 2008 ND 7, ¶ 7, 744 N.W.2d 277 (zoning ordinance); [*City of Belfield v.*] *Kilkenny*, 2007 ND 44, ¶ 28, 729 N.W.2d 120 (dog barking ordinance); *State v. Beyer*, 441 N.W.2d 919, 921-22 (N.D. 1989) (muffler requirement); *State v. Johnson*, 417 N.W.2d 365, 368-69 (N.D. 1987) (possessing explosives); *State v. Motsko*, 261 N.W.2d 860, 865 (N.D. 1977) (kidnapping); *State v. Hagge*, 211 N.W.2d 395, 398 (N.D. 1973) (negligent driving).

[¶27] In another line of cases, this Court recited the standard while refusing to decide the merits of facial vagueness claims when challengers could not show laws were vague as applied to their own conduct. In each of these cases, the Court explained litigants lacked "standing." We provided examples in *Wrigley II*, 2025 ND 26, ¶ 24:

> For example, in *State v. Tibor*, [373 N.W.2d 877, 879 (N.D. 1985)], a man challenged a gross sexual imposition law as being unconstitutionally vague. We reasoned the man could not advance "hypothetically unconstitutionally vague applications" based on conduct other than his own. *Id*. at 881. We decided the man lacked standing because he had not demonstrated the law "is impermissibly vague as applied to him." *Id.* In *State v. Holbach*, 2009 ND 37, 763 N.W.2d 761, a man brought a vagueness challenge to a law criminalizing stalking. We noted he did not claim the law was vague as applied to his own conduct. *Id.* ¶ 22. We explained that, outside the First Amendment context, litigants cannot rely on "potentially vague application in other circumstances." *Id.* ¶ 25. We rejected his claim because "a reasonable person would know [his] conduct was prohibited by the statute." *Id.* ¶ 26. In *State v. Ness*, 2009 ND 182, 774 N.W.2d 254, a man was convicted for failing to tag a deer. He had transported the deer from the field and was butchering it when he was cited for violation of a hunting proclamation. *Id.* ¶ 9. He argued the proclamation's use of the word "immediately" was unconstitutionally vague. *Id.* We decided he lacked standing to bring such a challenge because, under the circumstances of his case, "a reasonable person would know" his conduct violated the law. *Id.* In *Interest of D.D.*, 2018 ND 201, 916 N.W.2d 765, a person who had

16

been civilly committed challenged laws restricting the possession of firearms. He claimed the law was vague as to "what type of possession is required by the committed individual." *Id.* ¶ 15. We decided he lacked standing to argue whether the laws were "vague in other applications" because the law was not vague "as to his conduct." *Id.*

[¶28]  These decisions spoke in terms of "standing," but the Court did not dismiss any of them for lack of jurisdiction. Although not expressly articulated, the Court was presumably applying the concept of "standing" in a prudential sense. *See, e.g., Dickerson*, 604 F.3d at 742 ("Despite courts' baseline aversion to facial challenges, the limitations on third-party standing that restrict such challenges are prudential, not jurisdictional."). The Montana Supreme Court recently explained the concept of prudential standing:

> Prudential standing is a form of judicial self-governance that discretionarily limits the exercise of judicial authority consistent with the separation of powers. Prudential standing embodies the notion that courts generally should not adjudicate matters more appropriately in the domain of the legislative or executive branches or the reserved political power of the people. Prudential standing is a "malleable" concept, and "cannot be defined by hard and fast rules."

*Barrett v. State*, 547 P.3d 630, 645 (Mont. 2024) (cleaned up); *see also Kansas Bldg. Indus. Workers Comp. Fund v. State*, 359 P.3d 33, 49 (Kan. 2015) ("Prudential standing, on the other hand, embodies self-imposed judicial restraints on the exercise of jurisdiction.").

[¶29]  There are various reasons courts apply prudential standing principles in the context of facial vagueness challenges.

> First, doing so serves institutional interests by ensuring that the issues before the court are concrete and sharply presented. Second, claims of facial invalidity often rest on speculation. Third, facial challenges run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by

17

the precise facts to which it is to be applied. Fourth, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.

*Dickerson*, 604 F.3d at 741-42 (cleaned up).

[¶30]   In the vagueness context, exceptions to these prudential principles are grounded in the notion that vague laws may operate to inhibit the exercise of constitutionally protected conduct. "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)). Courts have described this as a "chilling" or "deterrent" effect. *See, e.g., Farrell v. Burke*, 449 F.3d 470, 497 (2d Cir. 2006) ("Therefore, to determine whether Farrell may bring his facial vagueness challenge, we must first determine whether the Special Condition will have a substantial chilling effect on protected conduct."); *Dickerson*, 604 F.3d at 742 ("The potential for such a deterrent effect outweighs the prudential considerations that ordinarily militate against third-party standing."). This Court has recognized the chilling or deterrent effect a vague law may have in the context of a vagueness claim advanced by anti-abortion protestors, explaining: "The prohibition against overly vague laws protects people from having to voluntarily curtail First Amendment activities because of a fear those activities could be characterized as illegal activities due to an unconstitutionally vague statute." *Fargo Women's Health Org., Inc. v. Lambs of Christ*, 488 N.W.2d 401, 409 (N.D. 1992).

[¶31]   The State has not advanced a rationale for why a vagueness claim related to speech or religion should be treated differently than a claim related to some other fundamental right. We explained the constitutional interests at issue in this case in *Wrigley II*, 2025 ND 26, ¶ 18:

> Through the enactments challenged here, it is indisputable the State is imposing restrictions on paramount aspects of its citizens' lives. *See State ex rel. Schuetzle v. Vogel*, 537 N.W.2d 358, 360 (N.D. 1995) (describing individual autonomy in medical decisions as a "fundamentally commanding" interest with "well-established legal

18

and philosophical underpinnings"). Even putting patient autonomy aside, the plaintiffs' right to engage in their lawful profession—practicing medicine—also is significant. *See* N.D. Const. art. I, § 7 ("Every citizen of this state shall be free to obtain employment wherever possible . . . ."); *see also State v. Cromwell*, 72 N.D. 565, 9 N.W.2d 914, 918-19 (1943) (describing the constitutional nature of "the right to follow one's individual preference in the choice of an occupation and the application of his energies"). Moreover, the conduct at issue encompasses more than simple commerce. Physicians are expected to apply their knowledge of medicine in a manner that will protect the health and lives of their patients. *See* N.D. Const. art. I, § 1 (declaring the right to defend life inalienable).

[¶32]   The State does not claim the right to life and health preserving medical care is less constitutionally protected than speaking freely or practicing a religion. Just as a vague protest regulation could chill or deter constitutionally protected speech, a vague abortion regulation has the potential to restrict the provision of constitutionally protected medical care. To the extent we have adopted an exception to the "all applications" or "no set of circumstances" standard for First Amendment facial vagueness claims, we are convinced that rationale applies with equal force to claims related to laws regulating the right to access health and life preserving medical care. Doing so, we need not define in this case the outer extent of what that constitutional right entails. The law before us unquestionably implicates the right to health and life preserving medical care by attempting to define exactly when an expectant mother may invoke it—i.e., when her health condition is sufficiently dire to permit a doctor to help abort her pregnancy in the interest of her safety. The constitutional implications are no broader. The provision in question does not implicate "all abortion," and consequently we need not decide whether "all abortion is constitutionally protected." Tufte, J., dissenting opinion, at ¶ 136. Our decision today also has no bearing on the standard for vagueness challenges to laws governing unprotected conduct. We acknowledge that, consistent with *Hoffman Estates*, this Court has applied the "all applications" standard to an ordinary business regulation. *See, e.g., Best Prods. Co. Inc. v. Spaeth*, 461 N.W.2d 91, 100 (N.D. 1990) (challenging Sunday closing law). We will consider the Plaintiffs' facial vagueness claim on its merits because the law in question defines when a

19

pregnant woman's life and health is sufficiently in jeopardy to justify terminating her pregnancy, a context unquestionably involving a mother's fundamental rights. *Wrigley I*, 2023 ND 50, ¶ 28 ("Because we hold the North Dakota Constitution provides a fundamental right to receive an abortion to preserve a pregnant woman's life or health, the constitutionality of N.D.C.C. § 12.1-31-12 must be analyzed under the strict scrutiny standard.").

V

[¶33]   The State argues the district court erred when it decided the N.D.C.C. ch. 12.1-19.1 health-risk exception is unconstitutionally vague. The State asserts the law is sufficiently specific to give physicians fair warning as to when an abortion is permissible healthcare and when it is a criminal act.

[¶34]   The N.D.C.C. § 12.1-19.1-03(1) health-risk exception permits: "An abortion deemed necessary based on reasonable medical judgment which was intended to prevent the death or a serious health risk to the pregnant female." The term "reasonable medical judgment" is defined as "a medical judgment that would be made by a reasonably prudent physician who is knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved." N.D.C.C. § 12.1-19.1-01(4). The exception's specific intent element— that the abortion be intended to protect the pregnant patient—is independent of the law's reasonableness assessment. The State asserts both requirements must be satisfied for the health-risk exception to apply, and we agree.

A

[¶35] We first address the State's arguments concerning the law's reasonableness standard. The State asserts the district court erred when it decided the law's "reasonable medical judgment" standard is confusing and vague. The State claims notions of reasonableness are commonly employed in criminal law, and the term "reasonable medical judgment" is well-understood by the medical community because it is the standard employed in medical malpractice cases. The State claims "there is nothing improper about imposing criminal liability on physicians when their conduct is objectively not reasonable" and including a subjective intent to prevent harm to the pregnant patient is

20

consistent with North Dakota's legal tradition in the analogous context of self-defense law.

[¶36] Reasonableness can be objective or subjective. *State v. Leidholm*, 334 N.W.2d 811, 816-17 (N.D. 1983). The difference is the standpoint from which the factfinder views the defendant's conduct. *Id.* An objective standard requires the reasonableness assessment to be "from the standpoint of a hypothetical reasonable and prudent person" without consideration of the defendant's unique characteristics or viewpoint. *Id.* at 817. Conversely, a subjective standard requires the factfinder to assess the circumstances from the defendant's point of view, accounting for what he or she honestly believed. *Id.* at 818. Under the subjective standard, the defendant's conduct is "viewed from the standpoint of a person whose mental and physical characteristics are like the accused's and who sees what the accused sees and knows what the accused knows." *Id.*

[¶37] Chapter 12.1-19.1, N.D.C.C., employs an objective reasonableness standard. It requires a factfinder to assess the reasonableness of a physician's conduct from the vantage of "a reasonably prudent physician who is knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved." N.D.C.C. § 12.1-19.1-01(4). The standard is objective because it does not involve consideration of what the accused physician actually knew or did not know, or what treatment the physician honestly believed was required. *See In re State*, 682 S.W.3d 890, 894 (Tex. 2023) (characterizing law with virtually identical language as an objective standard); *Karlin v. Foust*, 188 F.3d 446, 459 (7th Cir. 1999) (stating objective "reasonable medical judgment" standard imposes liability on physicians "without regard to his or her good faith attempt to comply" with the law).

[¶38] The State asserts objective reasonableness is a common legal test and cites cases where this Court upheld criminal laws employing objective notions of reasonableness in the face of vagueness challenges. For example, in *State v. Tranby*, 437 N.W.2d 817 (N.D. 1989), the Court held a law criminalizing negligent homicide was not unconstitutionally vague. The Court decided the statutory definition of "negligence," which included "unreasonable disregard" of risk, was "sufficiently explicit." *Id.* at 821. In *State v. Hanson*, 256 N.W.2d 364 (N.D.

21

1977), the Court held a law criminalizing reckless endangerment was not unconstitutionally vague. The law defined "recklessly" as a conscious disregard of risk "involving a gross deviation from acceptable standards of conduct." *Id.* at 367. In *State v. Hagge*, 211 N.W.2d 395 (N.D. 1973), the Court decided a law criminalizing vehicular manslaughter was not unconstitutionally vague. The law required drivers to be "careful and prudent," which the Court read to prohibit "careless and negligent" driving, a standard the Court considered sufficiently ascertainable. *Id.* at 398.

[¶39]   Unlike the laws in *Tranby*, *Hanson*, and *Hagge,* N.D.C.C. ch. 12.1-19.1 does not require proof of recklessness or negligence. It requires proof of a specific intent coupled with knowledge of a result. Various acts, defined together as "abortion," are criminal when done "with the intent to terminate" a pregnancy and "with knowledge" the unborn child is likely to die. N.D.C.C. § 12.1-19.1-01(1). The act is criminal if these elements are met no matter how competently it was performed. Notions of reasonableness under N.D.C.C. ch. 12.1-19.1 instead relate to the health-risk exception, which permits abortions "deemed necessary based on reasonable medical judgment" to protect the mother. N.D.C.C. § 12.1-19.1-03(1). The reasonableness standard in this context is more analogous to our laws governing self-defense and defense of others than it is to laws criminalizing negligent or reckless conduct. The State itself notes that, aside from this specific statutory provision, "self-defense is the only other area of criminal law addressing when it is permissible to end one life in order to protect another." *See also Wrigley I*, 2023 ND 50, ¶ 43 (Tufte, J., concurring and explaining that like an individual exercising self-defense, a "pregnant woman has a fundamental right to preserve her life and health with the aid of a physician").

[¶40]   Chapter 12.1-05, N.D.C.C., regulates when use of force may be employed to defend oneself or another. It contains a specific provision regulating use of deadly force by physicians, stating:

> 2. Deadly force is justified in the following instances:
>
> . . . .

22

f. When used by a duly licensed physician, or an individual acting at the physician's direction, if the force is necessary to administer a recognized form of treatment to promote the physical or mental health of a patient and if the treatment is administered in an emergency; with the consent of the patient. . . .

N.D.C.C. § 12.1-05-07(2)(f). "A defendant is entitled to have submitted to the jury all defenses for which there is any support in the evidence, whether consistent or inconsistent." *State v. Gagnon*, 1997 ND 153, ¶ 9, 567 N.W.2d 807. When evidence exists to support a defense under N.D.C.C. ch. 12.1-05, the State bears the burden of disproving the existence of the defense beyond a reasonable doubt. *City of Jamestown v. Kastet*, 2022 ND 40, ¶ 17, 970 N.W.2d 187. We have explained that use of force is legally justified when a person correctly believes force is necessary to prevent imminent harm, and use of force is lawfully excused when a person "reasonably but incorrectly believes force is necessary[.]" *Id. See also* N.D.C.C. § 12.1-05-01 (justification); N.D.C.C. § 12.1-05-08 (excuse).

[¶41] In the context of self-defense and defense of others, North Dakota has expressly rejected the objective reasonableness standard and instead adopted a subjective one. *See Leidholm*, 334 N.W.2d at 817-18 (reversing criminal conviction after the jury was given objective reasonableness self-defense instruction). Our state has a long history of assessing conduct undertaken in defense of life and health in this way. In 1907, this Court explained subjective reasonableness is the "more just" standard because it does not criminalize good-faith conduct:

We fully agree with appellant's counsel that defendant's conduct is not to be judged by what a reasonably cautious person might or might not do or consider necessary to do under the like circumstances, but what he himself in good faith honestly believed and had reasonable ground to believe was necessary for him to do to protect himself from apprehended death or great bodily injury. *While there is a diversity of judicial opinion upon the question, we think the better rule is that the circumstances bearing upon the reasonableness of defendant's belief must be viewed from the standpoint of defendant alone, and that he will be justified or excused if such circumstances were sufficient to induce in him an honest and reasonable belief that he was in danger. . . .* In some states the rule is that where a man acts upon appearances he does so at his peril; the test of reasonableness being that the

23

circumstances surrounding him at the time of the homicide must have been such as would induce a reasonably cautious man to believe that he was in imminent peril, and that it was necessary for him to kill his assailant in order to protect himself from death or great bodily harm, while the rule in other states is that the circumstances must be viewed from the standpoint of defendant alone, and that he will be justified or excused if such circumstances were sufficient to create in his mind an honest and reasonable belief that he was in such imminent danger. The question being an open one in this jurisdiction, we have decided to adopt the latter rule as the more just . . . .

*State v. Hazlett*, 113 N.W. 374, 380 (N.D. 1907) (emphasis added); *see also Kastet*, 2022 ND 40, ¶ 18 (stating the factfinder must view the circumstances "from the standpoint of the defendant to determine if they are sufficient to create in the defendant's mind an honest and reasonable belief that the use of force is necessary to protect himself or herself from imminent harm"); *State v. Jacob*, 222 N.W.2d 586, 589 (N.D. 1974) (explaining an objective standard allows convictions "using 20-20 hindsight").

[¶42] To the extent an abortion implicates a legal defense justifying or excusing the use of force, N.D.C.C. ch. 12.1-19.1 introduces an apparent conflict of law in North Dakota. A physician who acts with an honest but mistaken belief that an abortion was necessary to protect the life or health of a pregnant patient would be guilty of a crime under the objective reasonableness standard set out by N.D.C.C. ch. 12.1-19.1. Simultaneously, under the subjective reasonableness standard that applies to defenses under N.D.C.C. ch. 12.1-05, the same physician would be innocent because his belief that the abortion was necessary, although mistaken, was honest. On their face, these conflicting standards make it unclear whether a physician who performs an abortion in good faith will nonetheless suffer criminal penalties. We make no assessment as to whether or how these laws could be reconciled. For our purposes here, it suffices to say this new legislation has introduced considerable uncertainty in the context of abortions performed with the intent to protect the life or health of a pregnant patient.

[¶43] Notwithstanding this apparent statutory conflict, the State argues physicians are capable of understanding objective reasonableness because it is

24

the standard employed in medical malpractice cases. The Seventh Circuit Court of Appeals agreed with this logic in *Karlin*, 188 F.3d 446, when it addressed a vagueness challenge to a law using an objective reasonableness standard for determining if a medical emergency justified waiving informed consent requirements. The law at issue allowed imposition of civil liability, forfeiture of money, and professional discipline. *Id*. at 466. The court explained the degree of specificity due process requires depends on the severity of the penalties, *id.* at 458, and the court acknowledged "an objective standard is most vulnerable in the abortion context when a statute imposes criminal or quasi-criminal penalties." *Id.* at 467. The court upheld the law, reasoning its use of an objective reasonableness standard was consistent with "traditional theories of tort law," where physicians are accustomed to operating "under the specter of civil liability for unreasonable medical judgments." *Id.* The court rejected the vagueness challenge because the law imposed "no risk of incarceration nor is a violator labeled with the stigma of having been convicted of a misdemeanor or felony offense." *Id*. at 477.

[¶44] Unlike the law in *Karlin*, or civil malpractice litigation generally, N.D.C.C. ch. 12.1-19.1 applies an objective reasonableness standard while imposing severe criminal penalties. Violation of the law is punishable as a class C felony. N.D.C.C. § 12.1-19.1-02. We explained in *Wrigley II*:

> If the plaintiffs violate the statute, they may be fined $10,000 and imprisoned for five years. N.D.C.C. § 12.1-32-01(4). Along with the obvious hardships that accompany a conviction and sentencing for the commission of a felony, the plaintiffs face the prospect of losing democratic rights. *See* N.D. Const. art. II, § 2 (felons prohibited from voting); N.D.C.C. § 12.1-33-01 (felons prohibited from running for or holding public office). They also face the prospect of losing their medical license, a certification they presumably obtained with much effort and expense. *See* N.D.C.C. § 43-17-31(1)(c); N.D.C.C. § 12.1-33-02.1 ("A person may be denied a license, permit, certificate, or registration because of prior conviction of an offense if it is determined that such person has not been sufficiently rehabilitated, or that the offense has a direct bearing upon a person's ability to serve the public in the specific occupation, trade, or profession."). Their general reputation in the community also may suffer. *See State*

*ex rel. Olson v. Langer*, 65 N.D. 68, 256 N.W. 377, 387 (1934) ("[I]nfamy is a punishment as well as stigma on character."). The harsh punishment the plaintiffs face if they fail to conform their medical practice to the requirements of the law makes the degree of specificity required here very high.

2025 ND 26, ¶ 19.

[¶45]   In other jurisdictions, abortion regulations employing criminal sanctions have survived vagueness challenges when they used a subjective reasonableness standard that excepted good-faith conduct like our law governing self-defense and defense of others. For example, the Idaho Supreme Court rejected a vagueness challenge to a law permitting abortions when a physician determines "in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman." *Planned Parenthood Great N.W. v. State*, 522 P.3d 1132, 1203 (Idaho 2023). The Idaho court explained:

> The plain language of the above provision leaves wide room for the physician's "good faith medical judgment" on whether the abortion was "necessary to prevent the death of the pregnant woman" based on those facts known to the physician at that time. This is clearly a subjective standard, focusing on the particular physician's judgment. Contrary to Petitioners' arguments, the statute does not require *objective* certainty, or a particular level of immediacy, before the abortion can be "necessary" to save the woman's life.

*Id.* (emphasis in original); *see also A Woman's Choice-East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 109 (Ind. 1996) (explaining law regulating abortion with "good faith clinical judgment" standard means "a physician who acts with care and good faith has no rational fear of criminal prosecution"). We are convinced the objective reasonableness standard employed by N.D.C.C. ch. 12.1-19.1, which allows no exception for good-faith acts, coupled with the harsh criminal penalties the law imposes, creates a heightened risk of deterring physicians from engaging in constitutionally protected conduct.

B

[¶46]   The risk created by the law's objective standard and felony penalties is not necessarily fatal, but it demands clear and specific language. We turn to the State's contention the law is readily understandable by the medical community. The State claims its experts' testimony demonstrates physicians clearly understand what medical care is permissible under the law and what constitutes a felony. We disagree N.D.C.C. ch. 12.1-19.1 provides the clarity the State claims.

[¶47]   A number of the State's expert witnesses incorrectly opined that the statute's "reasonable medical judgment" is a subjective standard. For example, Dr. Jerry Obritsch, an obstetrician, testified the standard was subjective and explained: "Most of what we do in medicine is subjective." Dr. Charles Allen, an emergency medicine physician, testified the reasonable medical judgment standard is:

> [A] difficult definition because most of what I do is subjective. There's very little in medicine that's objective. So would a reasonable, prudent—or decision be subjective? Most of it would be.
>
> There's definitely objective data. There's results of a CAT scan, but that's subjective to the radiologist's interpretation, the specialist's interpretation, the emergency physician's interpretation.
>
> Lab data is objective, however, needs to be taken into consideration of what's the patient's past labs, what are they now, where are they going to. Same with any x-rays or other studies, they're all subjective. There's very little objective data. So, yes, a medical judgment would be subjective.

Dr. Samantha Kiedrowski, a family medicine practitioner, incorrectly opined the law only criminalizes malicious conduct. She testified:

> There could be a hypothetical scenario where there would be a physician who is malicious and making a poor medical judgment, but in my understanding, when you take the patient scenario into account and you come up with a diagnosis and a treatment plan, that's what constitutes medical judgment. And aside from a

27

physician who is attempting to be malicious, it would be considered reasonable.

[¶48]   The State's experts also provided testimony demonstrating confusion and disagreement relating to other terms used in the health-risk exception, which requires physicians to decide whether an abortion is necessary "to prevent the death or serious health risk to the pregnant female." N.D.C.C. § 12.1-19.1-03(1). The law defines "serious health risk" as a condition that "necessitates an abortion to prevent substantial physical impairment of a major bodily function, not including any psychological or emotional condition." N.D.C.C. § 12.1-19.1-01(5).

[¶49]   None of the State's experts were able to explain in clear terms what the term "serious health risk" means. Dr. Obritsch testified:

> Q. So looking at the word "serious," how do you determine whether a risk is serious or not under the law?
>
> A. It depends on reasonable medical judgment.
>
> Q. Do you have a working definition of the word "serious" in this context?
>
> A. Serious is a term that is applicable in different ways to different patients. What is serious to one patient may not be serious to another patient. . . .
>
> Who can predict what is a serious health risk in our profession regarding one patient versus another?

Dr. Charles Allen described it as a "subjective decision," and also could not articulate a clear meaning for the term:

> Q. . . . And what is your understanding of the term "serious health risk"?
>
> A. Serious health risk would be a risk that a physician, after examining, you know, the patient and the information, all the data you have about the case, that that patient—the physician would realize that there was potential for harm to the mother, to—and

terms to any type of bodily function—or there'd be any harm to her physically, and then, again, that—well, I think I've said every—on that one. I'd as soon go back to "and the informed consent," but you just asked about the—the definition.

Later, Dr. Allen clarified:

Q. How certain does a risk need to be for it to be considered serious?

A. There's so many variables in medicine, and each one of us is created differently and each one of our organs operate differently. And it is so variable, that it would all be speculation.

But it's a continuum.

 . . . .

Q. So where in that continuum that you described would you say that a certain condition becomes serious?

[. . . Objection from counsel. . . .]

THE WITNESS: I can't answer that question. I don't have a concrete answer for you.

Dr. Kiedrowski also could not articulate what the term meant:

Q. . . . [H]ow serious does it need to be that it will result in a more severe condition to be a serious risk?

A. The question was how certain does it need to be?

Q. Yes.

A. Okay. I can't put a number on that, I don't think, like a percentage.

Q. Would 50 percent risk of mortality make it serious?

A. Again, I can't put on a number on that. It would depend on the scenario and depend on the patient.

. . . .

Q. Would it depend on your subjective understanding of the case in front of you?

A. It would depend on the clinical scenario. It would depend on the patient's willingness to accept risk or not accept risk. The patient's preferences.

[¶50]   The State's experts also struggled to articulate a meaning for the term "substantial physical impairment." Dr. Obritsch testified:

Q. What is physical impairment under the law?

A. Physical impairment, medically speaking—I'm not sure under the law, because, again, now you're into the law. A physical impairment is anything that impairs a person from carrying on the activities that they normally are capable of doing.

Q. Do you have an understanding of what physical impairment means under the law?

A. I would have to research what the law states about physical impairment.

Q. So it's fair to say you do not have a working understanding of what physical impairment means under the law?

A. Correct.

Dr. Maureen Curley, a psychiatric nurse practitioner and university professor, also could not articulate a meaning for the term:

Q. And what makes physical impairment substantial rather than not substantial?

MR GAUSTAD: Objection. Vague.

A. I don't think I could answer that.

30

Q. Is substantial physical impairment a term you're familiar with from your training and experience?

A. I think that I would not know the difference. I mean I could not speculate on that.

Q. So is it fair to say that substantial physical impairment is not a term you're familiar with from your training and experience?

A. I think that general physical impairment I am, you know. Substantial I—would affect the life and health of the mother I would imagine.

Q. But you're not familiar with the term "substantial physical impairment"?

A. Not as a—I guess not as a particular definition and with specific criteria I am not.

Dr. Kiedrowski similarly testified:

Q. Is the term "substantial physical impairment" a term you've seen in your medical training or in the literature?

A. Again, I have not seen those three words put together in medical literature, similar to before.

. . . .

Q. How much damage to these systems would a patient need to suffer a substantial physical impairment?

A. That's a general question. That would depend on a specific clinical scenario.

Q. There's no objective standard of when damage to those systems constitutes a substantial physical impairment?

A. Not in a general sense, no.

31

[¶51]  The State's experts also provided conflicting testimony as to what the term "major bodily function" means. Dr. Allen testified:

> Q. So is that a yes, that there is a medical distinction between a minor and major bodily function?
>
> A. Yes.
>
> Q. And is the distinction the same between the definitions in the law and the definitions medically?
>
> A. They're—in my opinion, they're one and the same.

Dr. Kiedrowski, on the other hand, testified:

> Q. Are major bodily functions contrasted from minor bodily functions?
>
> A. That's not something that we contrast in medical literature, no.
>
> Q. You couldn't tell me which functions are major and which ones are minor?
>
> [. . . Objection by counsel. . . .]
>
> THE WITNESS: No. I couldn't make a list for you of those two.

[¶52]  The State's experts similarly disagreed as to whether mental health constitutes a "major bodily function." Dr. John Thorp, an obstetrician, testified:

> Q. Is mental health a major bodily function?
>
>  . . . .
>
> A. Yes, ma'am.
>
> [. . . Objection by counsel. . . .]
>
> Q. Is cognition a major bodily function?
>
> A. Yes, ma'am.

32

Dr. Curley responded to the contrary: "I see mental health differently than a bodily function." When asked whether "cognitive behavior could constitute a major bodily function," Dr. Allen responded differently: "A. Yeah. Q. And same with executive functions? A. Yes."

[¶53]  The State's experts also disagreed as to whether the health-risk exception would permit an abortion to treat risks caused by mental health disorders. Dr. Thorp testified abortions are generally not used to treat mental health disorders, and explained:

> But it seems to me that if a well-meaning, well-intended clinician, that's his or her prudential judgment, that this mental health disorder seriously impacts the life of this mother and that in ending pregnancy, that would prevent that from happening or would greatly lessen the likelihood of that happening, then she or he can make that decision.
>
> Q. Do you know if that's permitted under the amended abortion ban?
>
> A. I think it is.

Dr. Kiedrowski acknowledged mental health could pose a risk in "the setting of self-harm or suicidal ideation," but disagreed with Dr. Thorp that abortions would be permissible to treat mental health conditions. Dr. Kiedrowski testified:

> Q. So would an abortion be impermissible for a patient suffering from mental health issues?
>
> A. Under the law, abortion would be impermissible for those patients.

C

[¶54]  The State's experts' uncertainty about the language employed by the law demonstrates considerable disagreement as to what circumstances justify law enforcement imposing criminal charges. A conviction is not necessary to cause considerable disruption to a criminal defendant's life. Vague statutory language "allows policeman, prosecutors, and juries to pursue their personal

predilections," essentially leaving policymaking to unelected individuals instead of a duly elected legislative body. *Smith v. Goguen*, 415 U.S. 566, 575 (1974). Chapter 12.1-19.1, N.D.C.C., does not provide law enforcement with definitions for terms like "psychological or emotional condition," and "substantial physical impairment" and "major bodily function." Yet these terms are not beyond legislative description. *See, e.g.*, N.D.C.C. § 25-03.1-02(12) (defining "mentally ill person"); N.D.C.C. § 12.1-01-04(28) (defining "serious bodily injury"); N.D.C.C. § 12.1-01-04(30) (defining "substantial bodily injury"); N.D.C.C. § 65-05-12.2 (providing instructions for determining whether an injury constitutes a permanent impairment). The absence of clear guidelines under N.D.C.C. ch. 12.1-19.1 creates a substantial risk of ad hoc and subjective enforcement of the law by police and prosecutors. It is the legislature's responsibility to clearly define the bounds for the executive branch's exercise of the State's police power. The vagueness present in this law invites discriminatory and arbitrary enforcement to an extent requiring judicial intervention.

D

[¶55] We agree with the district court that, in the context of medical care the Plaintiff physicians perform with the intent of protecting the lives and health of their patients, N.D.C.C. ch. 12.1-19.1, does not give fair warning and allows for discriminatory and arbitrary enforcement. As we have explained, the law's use of an objective reasonableness standard criminalizes a physician's conduct regardless of whether he or she acts in good faith. To the extent an abortion may be permissible as self-defense or in defense of others, this new legislation has created an apparent conflict of law with existing statutes related to those legal concepts. The State's expert witnesses all testified they understood the law, but when asked about the meaning of essential terms the experts provided unclear and often conflicting responses. In the face of this uncertainty, the law imposes harsh felony penalties for non-compliance. These harsh penalties demand a high degree of specificity, which the State has not provided. For all of these reasons, the Plaintiffs have established N.D.C.C. ch. 12.1-19.1 operates to deter constitutionally protected conduct by means of vagueness, in violation of the due process guarantees set forth in Article I, § 12 of the North Dakota Constitution.

On these grounds, the court did not err granting summary judgment in favor of the Plaintiffs.

VI

[¶56] Having decided unconstitutional vagueness exists in N.D.C.C. ch. 12.1-19.1, we must determine whether the offending language can be severed from the rest of the legislation. *See* N.D.C.C. § 1-02-20 (stating a judgment declaring a law invalid "is confined in its operation" to the portion of the law "directly involved in the controversy in which such judgment has been rendered").

[¶57] "Severability is a question of statutory and constitutional interpretation by which we seek to determine legislative intent first and foremost by reference to the ordinary meaning of the enacted text." *Northwest Landowners*, 2022 ND 150, ¶ 37. "'[I]f a legislative act be in part unconstitutional, the valid portion shall stand, unless the result be one not contemplated or desired by the Legislative Assembly.'" *N.D. Legis. Assembly v. Burgum*, 2018 ND 189, ¶ 66, 916 N.W.2d 83 (quoting S*tate ex rel. Link v. Olson*, 286 N.W.2d 262, 274 (N.D. 1979)); *see also Baird v. Burke Cnty.*, 205 N.W. 17, 22 (1925).

[¶58] Our task is to analyze the law "as it would stand after striking from it those sections declared unconstitutional," and decide whether the legislature would have enacted the law without the offending provisions. *Arneson v. Olson*, 270 N.W.2d 125, 138 (N.D. 1978). "[I]f the constitutional and the unconstitutional portion are interdependent, such that the valid portion cannot be given effect without the invalid portion, we must declare the entire law invalid." *Northwest Landowners*, 2022 ND 150, ¶ 37; *see also Montana-Dakota Utilities Co. v. Johanneson*, 153 N.W.2d 414, 424 (N.D. 1967). Put differently, we must decide whether we can "invalidate and remove the offensive or damaging language without disturbing the rest of the law." *First Bank of Buffalo v. Conrad*, 350 N.W.2d 580, 584 (N.D. 1984).

[¶59] The unconstitutionally vague provisions in this legislation are found in language describing an exception to otherwise criminal conduct. This Court faced a similar issue in *State v. Fischer*, 349 N.W.2d 16 (N.D. 1984), where the question was whether a portion of a law creating a defense to issuing a check

with insufficient funds violated the Equal Protection Clause. *Id.* at 17. The offending provision created an unconstitutional classification based on a person's ability to pay within a certain time period. *Id.* at 18. The general prohibition on issuing a check with insufficient funds was not challenged. *Id.* The Court decided the defense could not be severed from criminal prohibition because without it:

> [A] person may be charged and convicted under that section for having issued a non-sufficient funds check irrespective of the issuer's good faith intent to honor the check. The unconstitutional language of Section 6-08-16, N.D.C.C., which makes payment of a check within ten days a defense to a criminal charge under that section, constitutes an important and integral part of the statute. That language serves to temper the harsh result of the strict liability element of the statute. We cannot conclude, therefore, that the 1983 Legislature intended the statute to stand without the affirmative defense. Consequently, we hold that Section 6-08-16, N.D.C.C., is unconstitutional and invalid in its entirety.

*Id.*

[¶60]   The unconstitutionally vague language in this case is in the N.D.C.C. § 12.1-19.1-03 health-risk exception. After striking that invalid provision, we are left with a general felony prohibition "for a person, other than the pregnant female upon whom the abortion was performed, to perform an abortion." N.D.C.C. § 12.1-19.1-02. This portion of the law imposing criminal penalties must also be struck because, if it remained intact, the legislation would criminalize even those abortions necessary to prevent the death of pregnant women. As this Court unanimously explained, "a pregnant woman has a fundamental right to obtain an abortion to preserve her life or her health." *Wrigley I*, 2023 ND 50, ¶ 40. Absent the criminal prohibition, which is an integral part of the legislation, the law is inoperable and must consequently be declared invalid in its entirely.

## VII

[¶61]   The State argues the district court erred in a number of other respects. The State asserts the court incorrectly decided an exception in the law allowing abortions up to six weeks of gestational age in cases of rape and incest is

unconstitutionally vague. *See* N.D.C.C. § 12.1-19.1-03(2). The State also asserts the court erred when it decided the law did not satisfy strict scrutiny in violation of the rights of pregnant women and girls guaranteed by N.D. Const. art. I, § 1. We do not address constitutional questions "unless such determination is absolutely necessary." *Espeland v. Police Magistrate's Court of City of Grand Forks*, 49 N.W.2d 394, 399 (N.D. 1951). "The separation of powers created by our state and federal constitutions requires courts to exercise judicial restraint and constitutional avoidance." *Overbo v. Overbo*, 2024 ND 233, ¶ 7, 14 N.W.3d 898. Because we have decided N.D.C.C. ch. 12.1-19.1 is unconstitutional on other grounds, we decline to reach the myriad other constitutional issues presented by the State.

## VIII

[¶62] The district court did not err in granting summary judgment and determining  Plaintiffs have established N.D.C.C. ch. 12.1-19.1 operates to deter constitutionally protected conduct by means of vagueness, in violation of their right to due process guaranteed by Article I, § 12 of the North Dakota Constitution. Because the vague parts of the law cannot be severed from the rest, N.D.C.C. ch. 12.1-19.1 should be invalided in its entirety. We would affirm the district court's judgment on these grounds only, and not decide the remaining issues before the Court.

[¶63]  Daniel J. Crothers
Lisa Fair McEvers
Daniel D. Narum, D.J.


**Tufte, Justice.**

[¶64]  I depart from the majority opinion in two significant respects. First, the majority opinion extends to the natural rights guaranteed by Article I, Section 1, the more stringent vagueness standard we have previously reserved for First Amendment rights that receive the additional protection of the chilling effect doctrine. Second, the majority opinion extends our precedent to allow a pre-

enforcement facial challenge in which the challengers present only hypothetical future conduct as the basis for the testifying experts' disagreement about the legal application of the statute. The parties' presentation of witnesses having expertise in medicine or history who disagree about lawyer-crafted hypotheticals is not a sufficient basis for a court to declare a statute unconstitutionally vague. The majority opinion recognizes a protection against chilling exercise of the natural right asserted here, without adequately framing the right or interpreting what scope of protection it may provide to abortion. As I explain below, even assuming a stricter vagueness standard should apply to statutes implicating a constitutional right, we must first interpret both the constitutional provision and the statute to resolve whether the statute conflicts with or otherwise implicates the constitutional right. I conclude the statute challenged here prohibits abortion only in circumstances that are outside the scope of the Section 1 right of "defending life" and "obtaining safety," and thus does not implicate Section 1 such that a more stringent vagueness standard may apply under Section 12. Chapter 12.1-19.1, N.D.C.C., is not void under our ordinary test for vagueness.

[¶65] The State appeals from a district court judgment declaring N.D.C.C. ch. 12.1-19.1 unconstitutional on its face. In January, a majority of this Court denied the State's motion for a stay of judgment pending appeal after concluding the statute was unlikely to withstand constitutional challenge. *Access Indep. Health Serv. v. Wrigley*, 2025 ND 26, 16 N.W.3d 902 ("Stay Op."). Two years earlier, when considering a preliminary injunction against enforcement of the predecessor statute, this Court concluded similarly. *Wrigley v. Romanick*, 2023 ND 50, 988 N.W.2d 231 ("Injunction Op."). Now, with full briefing and argument on the merits, the Court considers for the first time the ultimate issue of interpreting Article I, Section 1, of the North Dakota Constitution with respect to the Plaintiffs' fundamental rights and vagueness claims. The natural rights "of enjoying and defending life and liberty" and "pursuing and obtaining safety and happiness" by their own terms predate the constitution and limit legislation from infringing those rights as they were understood by the people of this state when they voted to adopt the constitution. Careful application of our longstanding framework for review of these issues yields the conclusion that

Chapter 12.1-19.1, N.D.C.C., is not in conflict with the natural rights protected by Section 1, nor is it unconstitutionally vague in violation of Section 12.

I

[¶66]   As discussed in Section III(C), we have applied a stricter vagueness standard when a statute implicates certain fundamental rights. Assuming the standard for evaluating a vagueness challenge depends on whether the challenged statute implicates a constitutional right outside the First Amendment context, we must first address the scope of the Section 1 rights asserted by the Plaintiffs. Without an understanding of the scope of the right, we cannot assess whether the challenged statute implicates the right, whether in the form of a direct conflict or in the form of a chilling effect, where that concept applies. We must also determine the scope of the right to resolve Plaintiffs' claim that the challenged statute infringes rights guaranteed by Section 1, requiring us to apply elevated constitutional scrutiny.

[¶67]   Both of the Plaintiffs' constitutional claims require us to interpret and articulate the scope of the Section 1 rights. The objective of our interpretive task is to find the ordinary meaning of the text to the people of the state when they adopted the constitutional statement.

II

A

[¶68]   The State appeals from the district court's order granting summary judgment to the Plaintiffs on their facial constitutional challenge to N.D.C.C. ch. 12.1-19.1. A claim that a statute is unconstitutional on its face is a question of law fully reviewable on appeal. *City of Fargo v. State*, 2024 ND 236, ¶ 10, 14 N.W.3d 902. Our review of a district court order granting summary judgment is also a question of law we review de novo. *Id.* ¶ 8.

B

[¶69]   This Court has a longstanding and consistent method of interpreting our constitution: we interpret the legal meaning of a constitutional provision by

determining how it would have been commonly understood by those who enacted it. *Sorum v. State*, 2020 ND 175, ¶¶ 19–20, 947 N.W.2d 382. We do that because all powers of government derive from the people of this state. N.D. Const. art. I, § 2 ("All political power is inherent in the people."); *McCarney v. Meier*, 286 N.W.2d 780, 784 (N.D. 1979). "The Constitution of the state is its paramount law. It is a self-imposed restraint upon the people of the state in the exercise of their governmental sovereign power, either by themselves through the initiative or by their agency, the Legislature." *Egbert v. City of Dunseith*, 24 N.W.2d 907, 909 (N.D. 1946).

> When interpreting constitutional provisions, we apply general principles of statutory construction. We aim to give effect to the intent and purpose of the people who adopted the constitutional provision. We determine the intent and purpose of a constitutional provision, if possible, from the language itself. In interpreting clauses in a constitution, we must presume that words have been employed in their natural and ordinary meaning.
>
> A constitution must be construed in the light of contemporaneous history—of conditions existing at and prior to its adoption. By no other mode of construction can the intent of its framers be determined and their purpose given force and effect. Ultimately, our duty is to reconcile statutes with the constitution when that can be done without doing violence to the language of either. Under N.D. Const. art. VI, § 4, we shall not declare a legislative enactment unconstitutional unless at least four of the members of the court so decide.

*SCS Carbon Transp. LLC v. Malloy*, 2024 ND 109, ¶ 19, 7 N.W.3d 268 (quoting *Sorum*, 2020 ND 175, ¶¶ 19–20).

[¶70]   The proper aim for courts interpreting the North Dakota Constitution is uncontroversial. Our "overriding objective is to give effect to the intent and purpose of the people adopting the constitutional provision." Injunction Op., 2023 ND 50, ¶ 17; *State v. Blue*, 2018 ND 171, ¶¶ 22–23, 915 N.W.2d 122. Nearly 50 years ago, this Court expressed the same standard in a slightly different way:

> In construing a written constitution we must make every effort to determine the intent of the people adopting it. *State ex rel. Vogel v.*

40

*Garaas*, 261 N.W.2d 914 (N.D. 1978); *State ex rel. Sanstead v. Freed*, 251 N.W.2d 898 (N.D. 1977); *State ex rel. Lein v. Sathre*, 113 N.W.2d 679 (N.D. 1962); *State ex rel. Lyons v. Guy*, 107 N.W.2d 211 (N.D. 1961); 1 Cooley's Constitutional Limitations (8th ed.), Ch. 4, p. 124.

We must examine the whole instrument in order to determine the true intention of every part so as to give effect to each section and clause. If different portions seem to be in conflict, we must make a true effort to harmonize them if practicable.

In interpreting clauses in a constitution we must presume that words have been employed in their natural and ordinary meaning.

"As Marshall, Ch. J., says: 'The framers of the constitution, and the people who adopted it, "must be understood to have employed words in their natural sense, and to have intended what they have said." ' " 1 Cooley's Constitutional Limitations, p. 130.

Both parties contended that contemporaneous construction, as an aid in construction and interpretation of the constitution, recognized in this court in *State ex rel. Sanstead v. Freed*, 251 N.W.2d 898 (N.D. 1977), and its predecessors, favored its point of view on the construction of § 148 of the North Dakota Constitution. We, however, note that in *Sanstead* an early Attorney General's opinion was available, in addition to long-standing practices, whereas here we have only early legislative Acts carried forward, but relatively little evidence on practices except for the current practice of the Bismarck School District.

*Cardiff v. Bismarck Pub. Sch. Dist.*, 263 N.W.2d 105, 107 (N.D. 1978).

C

[¶71] The Plaintiffs contend that N.D.C.C. ch. 12.1-19.1 violates fundamental constitutional rights protected by Article I, Section 1 of the North Dakota Constitution. This provision provides: "All individuals are by nature equally free and independent and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property and reputation; pursuing and obtaining safety and happiness . . . which shall not be infringed."

[¶72]   The parties' arguments frame the fundamental rights protected by Section 1 in different ways.[2] The Plaintiffs describe their claim as a "constitutional right to obtain life- and health-preserving abortions" and a "fundamental right to abortions to preserve a pregnant person's health." Alternatively, and more grounded in the constitutional text, they reference "fundamental rights to 'enjoy[] and defend[] life' and 'pursu[e] and obtain[] safety.'" Finally, and more expansively, the Plaintiffs ask for recognition of a "person's general right to bodily integrity," "a right to bodily autonomy, which necessarily includes a right to obtain an abortion," and "an individual's right to control their own body and to exercise self-determination." The State describes the right at issue as "a fundamental right to abortion," a "right to on-demand abortions," a "right to a medically necessary abortion," and a "right to kill unborn children with a 'life-limiting' diagnosis." The State also argues that "conceptualizing medically necessary abortions as a self-defense right underscores why there is not a right to mental health abortions."

[¶73]   How this Court characterizes the rights claim is a threshold issue because our interpretive analysis is influenced by whether the right is conceived of as a right of "defending life" by means of abortion or a right to abortion for certain purposes or under certain conditions. This framing of the right affects how we approach the evidence of meaning, both historical and textual, as we interpret both the constitution and the challenged statute. As with the rest of our interpretive task, the answer to the framing question must also be "construed in the light of contemporaneous history," and thus rooted in evidence of what was the understanding of the enacting public. *Sorum*, 2020 ND 175, ¶ 20.

[¶74]   Section 1 declares North Dakotans "have certain inalienable rights." As a textual matter, this is a recognition of rights already possessed, not a provision creating rights. Section 1 then lists some, but expressly not all such rights, by introducing these rights with "among which are . . . ." Because the word

---

[2] The majority opinion focuses solely on the State's arguments. Because this Court reviews the district court's conclusions de novo and because the party challenging a statute's constitutionality bears the burden, the discussion below considers the arguments both parties made to the district court and on appeal.

"abortion" does not appear in the constitution, an abortion-specific framing of the right would have to be necessarily implied in one of the listed rights, or it would have to be a distinct but unlisted natural right. As discussed below in Section III, framing the right as a right to abortion as such is inconsistent with the available evidence considered according to our interpretive method.

## III

### A

[¶75]   Rarely is this Court called on to interpret a constitutional claim with so little precedent relevant to the substance of the claim and yet with such capable advocacy and deeply felt convictions motivating people on both sides of the issue. In such cases, it is especially important that we thoroughly analyze the claim according to the interpretive methods set forth in our many prior decisions resolving questions both controversial and mundane. Particularly when interpreting a provision dating to the original 1889 North Dakota Constitution, we must be sensitive to the possibility that the surface semantic meaning to modern readers and interpreters may not reveal the plain or ordinary meaning for purposes of establishing the legal meaning of the text. The older the text, the greater the potential a court may fail to appreciate the significance of changes in legal context, usage of language, and other factors, especially when interpreting broad terms like "liberty," "safety," and "happiness."

[¶76]   In their amended complaint, Plaintiffs cite N.D. Const. art. I, §§ 1 and 12, as the basis for their two claims for relief. To a person reading Section 1 in the year 2025, the terms "enjoying and defending life and liberty" and "pursuing and obtaining safety and happiness" may convey a meaning in ordinary modern English that is broad enough to support the Plaintiffs' constitutional claim. But the legal meaning of a constitution or statute does not change when the language evolves. Laws change when properly amended. Accordingly, courts must always ask what the enacted words meant to the people who exercised the power to make those words part of our fundamental law. The words "enjoying . . . liberty" and "pursuing . . . happiness" are superficially broad enough to implicate a vast array of laws, so we must carefully consider the relevant history to understand their meaning to the enacting public in proper

43

context. Only in this way can we determine today what limits these words place on the State's broad police power.

[¶77]   If the Plaintiffs' proposed interpretation is correct, any statutes regulating abortion were impliedly repealed either in 1889 when the constitution was adopted or in 1984 when Section 1 was amended. *State v. Strom*, 2019 ND 9, ¶ 8, 921 N.W.2d 660. To accept Plaintiffs' arguments and invalidate N.D.C.C. ch. 12.1-19.1 under Section 1, the Court has limited options: (1) declare an abortion right was implicit in the 1889 constitution according to our traditional interpretive methods and the historical sources; (2) interpret the 1984 amendment as including a broad and previously unrecognized women's rights component; (3) set aside our consistent method for interpreting statutes and constitutional provisions according to their ordinary meaning as of the enactment date in favor of a "living" constitution approach; or (4) interpret Section 1 as providing a fixed legal standard that depends on circumstances that have changed since 1889. As discussed in detail below, the natural rights guaranteed by the language adopted as Section 1 were understood in 1889 to secure from further legislative encroachment certain rights and liberties then known to the people. Section 1 has implications for abortion regulation, but it leaves significant room for legislative accommodation of competing interests and policy choices.

B

1

[¶78]   Our starting point is the text, because "[w]e determine the intent and purpose of a constitutional provision, if possible, from the language itself." *Malloy*, 2024 ND 109, ¶ 19.

> All individuals are by nature equally free and independent and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property and reputation; pursuing and obtaining safety and happiness; and to keep and bear arms for the defense of their person, family, property, and the state, and for lawful hunting, recreational, and other lawful purposes, which shall not be infringed.

N.D. Const. art. I, § 1. Plaintiffs principally rely on Section 1's recognition that "[a]ll individuals" have the "inalienable rights" of "enjoying and defending life" and "pursuing and obtaining safety." Absent from the text of Section 1, or any other provision of the North Dakota Constitution, is any explicit mention of abortion.

[¶79]   The plain meaning of Section 1 is insufficient to resolve the interpretive question. A typical reader today reading the bare, literal language of Section 1 without considering the context or other interpretive aids may conclude a wide range of activities fit within the phrases "defending life" and "pursuing and obtaining safety." Some constitutional text is so clear that it may provide both the starting point and the stopping point. *Thompson v. Jaeger*, 2010 ND 174, ¶¶ 12–13, 788 N.W.2d 586 (directly applying "the plain and unambiguous language of the self-executing and mandatory provisions of N.D. Const. art. III"); *Preference Pers., Inc. v. Peterson*, 2006 ND 35, ¶ 8, 710 N.W.2d 383 (starting and ending statutory interpretation with "plain reading"). Addressing unambiguously clear text is the function of the plain meaning rule. As the U.S. Supreme Court has often put it, a provision's meaning is "plain" if it "cannot be read in any other way." Marco Basile, *Ordinary Meaning and Plain Meaning*, 110 Va. L. Rev. 135, 156 (2024) (citing *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise . . . .")). Here, the contextual and structural clues signal that we may not treat this provision as having a plain meaning that answers the interpretive question before us. *But see* Stay Op., 2025 ND 26, ¶ 31 ("We need not resort to the historical record when the Constitution's language is clear.").

[¶80]   The broad language of Section 1 is a signal to the Court that we may not start and end with the text under the plain meaning rule. *See State ex rel. Sandaker v. Olson*, 260 N.W. 586, 589 (N.D. 1935) ("It is idle to talk of 'interpreting' language so plain, or attempt a 'construction' beyond the clear meaning of the words used by the framers of the Constitution, simply because an exigency has arisen."). To conclude that "defending life and liberty" or "pursuing and obtaining safety and happiness" have a meaning so plain the task of

interpretation ends with the bare text would imply an extraordinarily broad judicial check on legislative power inconsistent with numerous prior cases. *See, e.g., Nw. Landowners Ass'n v. State,* 2022 ND 150, ¶ 32, 978 N.W.2d 679 (quoting *State v. Cromwell*, 9 N.W.2d 914, 919–20 (N.D. 1943)) ("Under the police power 'the legislature may, within constitutional limitations, not only prohibit all things hurtful to the comfort, safety, and welfare of society, but prescribe regulations to promote the public health, morals, and safety, and add to the general public convenience, prosperity, and welfare.'"); *see also State v. Riggin*, 2021 ND 87, ¶ 14, 959 N.W.2d 855 (quoting *Cromwell*, 9 N.W.2d at 919) (explaining police power "must be confined to such restrictions and burdens as are thus necessary to promote the public welfare, or in other words, to prevent the infliction of public injury"). Such an approach would trigger strict scrutiny review of any regulation claimed to interfere with a person's defense of liberty or pursuit of safety and happiness. Needless to say, our precedent applies far more deferential review. *Best Prods. Co., Inc. v. Spaeth*, 461 N.W.2d 91, 96 (N.D. 1990) ("Under this rational basis standard, we uphold legislation unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose."); *Larimore Pub. Sch. Dist. No. 44 v. Aamodt*, 2018 ND 71, ¶ 34, 908 N.W.2d 442 (citation omitted) ("When no suspect class, fundamental right, or important substantive right is involved, we apply a rational basis standard and sustain the legislative classification unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose."). Clearly, the Court must do more than ask whether abortion is within the literal meaning of "defending life and liberty" or "obtaining safety."

[¶81] There is more than one plausible interpretation of "defending life and liberty." The Century Code has prohibited abortion in most circumstances since before statehood. And yet, the fundamental right Plaintiffs claim protects abortion was apparently overlooked by every person alive when Section 1 was adopted and by almost everyone else in the time since. The fact that it took more than a century for Section 1 to be asserted against any of the statutes criminalizing abortion refutes any notion that the language "defending life and liberty" or "pursuing and obtaining safety" *plainly* limits state regulation of abortion. We have extensive historical evidence of frequent prosecutions which

46

would have been defeated by the constitutional claims raised here. *See, e.g., State v. Reilly*, 141 N.W. 720, 728 (N.D. 1913) (affirming murder conviction including abortion as predicate felony without mention of constitutional claim); *State v. Moeller*, 138 N.W. 981 (N.D. 1912) (same); *State v. Belyea*, 83 N.W. 1, 3 (N.D. 1900) (same). If, beginning in 1889, the plain meaning of Section 1 clearly included non-lifesaving abortion, surely one of the persons prosecuted for the crime would have raised a Section 1 claim in their defense. The plain meaning of the text of Section 1 does not resolve our question here.

2

[¶82]   Having determined that the plain meaning rule does not end our analysis, we must consider whether the ordinary and commonly understood meaning of the rights described in Section 1 nonetheless protects abortion directly or imposes such limits by necessary implication. *Blue*, 2018 ND 171, ¶ 23; *City of West Fargo v. McAllister*, 2022 ND 94, ¶ 6, 974 N.W.2d 393; *Bd. of Trs. of N.D. Pub. Emps. Ret. Sys. v. N.D. Legis. Assembly*, 2023 ND 185, ¶ 11, 996 N.W.2d 873; *Cardiff*, 263 N.W.2d at 107 (presuming "natural and ordinary meaning"); *State v. Sherman*, 245 N.W. 877, 882 (N.D. 1932) (applying "ordinary and obvious meaning"). Ordinary meaning refers to the informational content that statutory words and phrases communicate to an ordinary person. *State v. Velasquez*, 1999 ND 217, ¶ 4, 602 N.W.2d 693 ("Words in a statute are to be understood in their ordinary sense, that is the meaning an ordinary person could get from reading the section."); *see also* N.D.C.C. § 1-02-02; *Huether v. Nodak Mut. Ins. Co.,* 2015 ND 272, ¶ 9, 871 N.W.2d 444 (quoting *Martin v. Allianz Life Ins. Co.,* 1998 ND 8, ¶ 12, 573 N.W.2d 823) ("The ordinary meaning is the definition a non law-trained person would attach to the term."); *State v. Wallace*, 187 N.W. 728, 730 (N.D. 1922) (explaining an "ordinary term" is "easily capable of comparatively accurate definition" and is so to "the mind of the layman and lawyer alike").

[¶83]   A leading treatise on legal interpretation describes "ordinary meaning" as "the most fundamental semantic rule of interpretation." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012). "Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense. . . . Interpreters should not be required

47

to divine arcane nuances or to discover hidden meanings." *Id.* This is consistent with how we have described the search for ordinary meaning. *Cont'l Hose Co. v. City of Fargo*, 114 N.W. 834, 836 (N.D. 1908) (stating the Court will apply the "common meaning" of a term unless the plaintiff meets its burden that a technical meaning was meant); *Wallace*, 187 N.W. at 732 ("It is not the duty of this court to legislate nor to search for a hidden meaning of plain and hitherto unambiguous words employed by the Legislature."). Ordinary meaning is the meaning that is "commonly understood." *See Tormaschy v. Hjelle*, 210 N.W.2d 100 (N.D. 1973); *Newman v. Hjelle*, 133 N.W.2d 549, 555–57 (N.D. 1965) (considering newspaper advertisements, publicity pamphlets, and statutes in effect as evidence of how the framers and the people who adopted a provision understood it); *Salzseider v. Brunsdale*, 94 N.W.2d 502, 504 (N.D. 1959) (explaining ordinary or commonly understood meaning); *see generally* Marco Basile, 110 Va. L. Rev. at 151 ("[O]rdinary meaning is what the statutory text would convey to a reasonable English user in . . . 'ordinary' communication.").

[¶84]   To discern the ordinary meaning of Section 1, we consider the meaning of the words at the time of enactment, by reference to contemporary usage, including dictionaries. *See Hanneman v. Cont'l W. Ins. Co.,* 1998 ND 46, ¶ 31, 575 N.W.2d 445 (citation omitted) ("The dictionary is a good source to determine the plain, ordinary definition of an undefined term."); *see also State v. Willard*, 2022 ND 34, ¶ 13, 970 N.W.2d 197 (applying the dictionary term as "the ordinary meaning of the term"); *State v. Monson*, 518 N.W.2d 171, 174 (N.D. 1994) (describing dictionary definition of the term "contact" as the "ordinary meaning" of the term); *State v. Wolff*, 512 N.W.2d 670, 672 (N.D. 1994) (describing dictionary definition of the term "serve" as "the ordinary meaning"); *Cont'l Hose Co.*, 114 N.W. at 836 (using dictionary term to describe "ordinary meaning" of the term). We consider grammar, look for legal terms of art, and consider the surrounding text. *See, e.g., N.W. Bell Tel. Co. v. Wentz*, 103 N.W.2d 245, 253-54 (N.D. 1960) (focusing on the grammar of the statute to interpret its intent). Evidence of the drafters' intent is relevant, but is secondary to evidence of the enacting voters' understanding. *State v. Taylor*, 133 N.W. 1046, 1050 (N.D. 1911) (stating understanding of convention delegates "not controlling" but an aid to determine the understanding of the ratifying public); *Sonnesyn v. Akin*, 97 N.W.

557, 561 (N.D. 1903) (explaining legislature's expanded definition of the term, enlarging the "legislative definition" beyond "the common and ordinary meaning of the term"). Statements about a provision's purpose may be relevant if known to the voting public. Other contemporaneous public explanations or characterizations by advocates and opponents may also inform what the public understood as to a provision's meaning. *Newman*, 133 N.W.2d at 555–57. Implicit in our interpretive rules' focus on the date of enactment is the notion that the meaning is fixed as of that date until the provision is amended. *State v. McGinnis*, 2022 ND 46, ¶ 14, 971 N.W.2d 380 (explaining that the Court's interpretation declares what the text means "at all times before it was amended"); *Egbert*, 24 N.W.2d at 910.

[¶85]   The Plaintiffs and their amici cite to several statehood-era dictionaries to support their proposed ordinary meaning of Section 1. To aid our interpretation of the ordinary meaning of "enjoying and defending life," the Plaintiffs cite dictionary definitions for "enjoy," "defend," and "life." "Enjoy" may be defined as "[t]o have, possess, and use with satisfaction; to occupy, as a good or profitable thing, or as something desirable; as, to *enjoy* a free constitution and religious liberty." *Webster's Complete Dictionary* 449 (1886). Similarly, "enjoyment" may be defined as "[t]he exercise of a right; the possession and fruition of a right." Henry C. Black, *A Dictionary of Law* 421 (1891). "Defend" may be defined as "[t]o repel danger or harm from; to protect; to secure against attack; to maintain; to uphold; as, to *defend* a town; to *defend* a cause; to *defend* character; to *defend* the absent." *Webster's Complete Dictionary* 345 (1886). "Life" may be defined as "[t]hat state of an animal or plant in which its organs are capable of performing their functions" or "[t]he time during which the human soul and body are united." *Id.* at 771.

[¶86]   We also consider contemporaneous dictionary definitions as an aid in interpreting the right of "pursuing and obtaining safety." As Plaintiffs note, these dictionaries define "pursue" as to "seek" or "use measures to obtain"; "obtain" as to "get hold of by effort," "gain possession of," or "acquire"; and "safety" as "freedom from danger or hazard; exemption from hurt, injury, or loss." *Webster's Complete Dictionary* 904, 1065, 1162 (1886).

49

[¶87]   No evidence has been presented, and we have found none, that there was any discussion at the constitutional convention or in newspapers leading up to the adoption of the constitution about the scope of Section 1. More particularly, there is no indication either way about potential relevance to state regulation of abortion or any other medical practice or procedure. Despite Section 1's affirmation of Lockean natural rights, there was little or no contemporaneous discussion as to whether or to what extent Section 1 would curtail the legislative power when a statute is alleged to infringe natural rights of life, liberty, property, reputation, safety, and happiness. The ordinary meaning of these words and phrases, broad though it appears to be, is one piece of the interpretive puzzle.

3

[¶88]   When interpreting a legal document, including our state constitution, "[w]e must examine the whole instrument in order to determine the true intention of every part so as to give effect to each section and clause." *Cardiff*, 263 N.W.2d at 107; *Kelsh v. Jaeger*, 2002 ND 53, ¶ 19, 641 N.W.2d 100; *McCarney v. Meier*, 286 N.W.2d 780, 785 (N.D. 1979).

[¶89]   Judicial recognition and enforcement of express and implied natural rights in Section 1 are in tension with this Court's precedent on the broad scope of the legislature's police power. Through our state constitution, the people delegated to the Legislative Assembly all legislative power, subject only to express restrictions. *Blue*, 2018 ND 171, ¶ 23 ("Under the Constitution of this state all governmental sovereign power is vested in the Legislature, except such as is granted to the other departments of the government, or expressly withheld from the Legislature by constitutional restrictions." (cleaned up)); *Ex parte Corliss*, 114 N.W. 962, 966 (N.D. 1907) ("Mr. Cooley, in speaking of the extent of powers delegated by the people to the Legislature, says: 'They must be understood to grant the whole legislative power which they possessed, except so far as, at the same time, they saw fit to impose restrictions.'"). "The term 'police power', as understood in American constitutional law, means simply the power to impose such restrictions upon private rights as are practically necessary for the general welfare of all." *Riggin*, 2021 ND 87, ¶ 14; *Corliss*, 114 N.W. at 979 (Spalding, J., dissenting) ("There is in every sovereignty an inherent right and plenary power

50

to make all such laws as are necessary to a proper preservation of public security, order, health, morality and justice. This power is called the police power."). To reinforce the exclusion of the rights declared in Article I from the police power, Section 20 of that Article provides: "To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate." N.D. Const. art. I, § 20.

[¶90]   Plaintiffs assert the broad declaration of natural rights in Article I, Section 1, conflicts with the abortion statute the legislature enacted under the state's broad police power. Conflicts between the ordinary meaning of these natural rights of enjoying liberty and obtaining safety and happiness and an otherwise plenary legislative police power are unavoidable. Our limited judicial role requires a principled way to resolve conflicts that does not depend on judicial discretion about the relative importance of natural rights and legislation. The task of balancing broad and underspecified individual rights against broad, legislative powers limited only by those underspecified rights is inherently legislative in character. That power is not given to the judicial branch of government. This structural tension and the separation of powers limits our judicial task to determining what natural rights had sufficient historical pedigree to constitute necessarily implied limitations on legislative power. To resolve this apparent structural conflict within the constitution, we must look for interpretive guidance in historical understanding of these natural rights as a limit on legislative power.

4

[¶91]   As part of considering the "conditions existing at and prior to its adoption," *Malloy*, 2024 ND 109, ¶ 19, we consider the legal context in which a provision was adopted, including the statutory and common law background against which the new language was adopted, *Smith v. Isakson*, 2021 ND 131, ¶ 12, 962 N.W.2d 594, and prior authoritative interpretations if the language was adopted from another jurisdiction, *Bd. Trs. of N.D. Pub. Emps. Ret. Sys.*, 2023 ND 185, ¶ 11.

51

[¶92]   At the time the people of North Dakota voted to approve Section 1 as part of the original 1889 constitution, abortion was prohibited under territorial law unless necessary to save the life of the pregnant woman. *See MKB Mgmt. Corp. v. Burdick*, 2014 ND 197, ¶ 36, 855 N.W.2d 31. In most circumstances, abortion was a criminal offense when the constitution was adopted: "Every person who administers to any pregnant woman . . . to take any medicine, drug or substance, or uses or employs any instrument, or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment." Compiled Laws of the Territory of Dakota, § 6538 (1887); Revised Codes of the Territory of Dakota, § 337 (2d ed. 1877) (same).

[¶93]   The parties and the amicus curiae discuss the records of the convention, and our research confirms there was no specific discussion of abortion and little record at all of discussion or debate about the declaration of rights. *MKB Mgmt.*, 2014 ND 197, ¶ 37; Burleigh F. Spalding, *Constitutional Convention, 1889*, 31 N.D. Hist. J. 151, 159 (1964) (explaining there "was little or no difference of opinion over the Articles to be contained in the Bill of Rights"). One of the amicus briefs points out that a convention delegate argued "this Convention should throw all the safeguards it is possible to throw, around the rights of the people," but this comment is unhelpful here because it was specifically "against the consolidation of [railroad] monopolies," not in reference to the natural rights clause or the declaration of rights more generally. *Official Report of the Proceedings and Debates of the First Constitutional Convention of North Dakota* 376–77 (1889).

[¶94]   Thomas Cooley, the leading jurist and scholar of state constitutions of the era, spoke to the 1889 convention. His treatise provides relevant context for the meaning of state declarations of natural rights. "We shall also expect a declaration of rights for the protection of individuals and minorities," which usually contains provisions "declaratory of the fundamental rights of the citizen: as that all men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety and happiness." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union*

45 (5th ed. 1883). He explained that "since, while they continue in force, they are to remain absolute and unchangeable rules of action and decision, it is obvious that they should not be made to embrace within their iron grasp those subjects in regard to which the policy or interest of the State or of its people may vary from time to time." *Id.* at 46. The rights guarded and protected by the constitution do not owe their origin to it; the constitution is "a limitation upon the powers of government in the hands of agents" and is "necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought." *Id.* at 47.

[¶95]   The convention delegates drafted, and the people approved, the language of Section 1 with the knowledge that a majority of existing states had a natural rights guarantee. At least 24 states had natural rights guarantees in their state constitutions prior to 1889. *See generally* Steven G. Calabresi & Sofia M. Vickery, *On Liberty and the Fourteenth Amendment: The Original Understanding of the Lockean Natural Rights Guarantees*, 93 Tex. L. Rev. 1299 (2015). If there is a known source of a provision, we generally apply any authoritative interpretations of the language from that source jurisdiction that were issued prior to our adopting the language. *Bd. Trs. of N.D. Pub. Emps. Ret. Sys.*, 2023 ND 185, ¶ 11 ("When North Dakota adopts a statutory or constitutional provision from another jurisdiction, we presume the language was adopted with knowledge of the interpretation given to it by the source jurisdiction."). There is no known single source for Section 1, but several sources considered by the delegates to our constitutional convention. *See* Nicholas S. Samuelson, *Digging for Roots in All the Wrong Places*, 95 N.D. L. Rev. 495 (2020); Herbert L. Meschke & Lawrence D. Spears, *Digging for Roots: The North Dakota Constitution and the Thayer Correspondence*, 65 N.D. L. Rev. 343 (1989). The language adopted as Section 1 does not replicate any previous natural rights provision.

[¶96]   No party or amicus has cited a pre-1889 interpretation of another state's natural rights provision that provides guidance for our interpretation of the rights claimed here. Prior to 1889, several states had applied natural rights clauses to invalidate legislation. *See generally* Calabresi & Vickery, 93 Tex. L. Rev. 1299 (discussing several decisions declaring slavery unconstitutional, decisions from Vermont and Indiana invalidating other laws, and several dozen discussing natural rights clauses but not invalidating the challenged statute). The

understanding of the people who ratified our constitution in 1889 may have been informed by these decisions that natural rights clauses had been applied to void legislative enactments, but beyond the proposition that these provisions were understood as providing some enforceable limits on legislation, the pre-1889 decisions from other states provide little guidance on what would have been understood about the scope of the life, liberty, safety, and happiness rights claimed here. Post-1889 decisions of other states interpreting their natural rights clauses may be relevant if persuasive, but of course when our state adopts language from another jurisdiction, only the then-existing judicial interpretation is potentially authoritative. Decisions of other courts published after our adoption of Section 1 do not inform us about the meaning of the North Dakota Constitution as understood by the people of this state who adopted it.

5

[¶97] We give "a great deal of weight" to contemporaneous legislative and executive interpretation and implementation of constitutional provisions. *Fed. Land Bank of Saint Paul v. Gefroh*, 418 N.W.2d 602, 604 (N.D. 1988). The available evidence of legislative enactments and executive enforcement in the years following adoption of Section 1 provides no support for the proposition that the people of this state who adopted the constitution understood the ordinary meaning of the natural rights of "defending life and liberty" and "pursuing and obtaining safety" to broadly alter the legal status of abortion from its then-existing practice. As set forth below, no lawmaker, judge, or physician is known to have treated Section 1 as implicating existing abortion regulation, which permitted abortion only when necessary to preserve the pregnant woman's life. No physician who was prosecuted for non-lifesaving abortion in the years following enactment is known to have raised a constitutional defense. To be sure, mere delay in raising a constitutional claim does not establish the claim is unsound, but it weighs against a conclusion that the proposed interpretation is consistent with the ordinary and commonly understood meaning of the constitution. Cooley's Const. Lim. 85 ("Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the Constitution, and appointed judicial tribunals to enforce it.").

54

[¶98] The laws of Dakota Territory continued in force unless they were in conflict with the constitution. *Dawson v. Tobin*, 24 N.W.2d 737, 743 (N.D. 1946) (citing Sec. 2, Schedule N.D. Const.). The parties have cited no evidence that any person believed the state constitution conflicted with the territorial laws restricting abortion and thus repealed them by implication. To the contrary, these abortion statutes were recodified on several occasions after the constitution was adopted. *MKB Mgmt.*, 2014 ND 197, ¶ 36 (citing N.D.R.C. §§ 8912, 8913 (1905); N.D. Compiled Laws §§ 9604, 9605 (1913); N.D.R.C. ch. 12–25 (1943); N.D.C.C. ch. 12–25 (1960)). The 1905 revised code contained the same abortion restrictions found in the territorial code in § 8912. *See also* § 8817 (intentional destruction of "a quick child" by drug or any instrument is manslaughter in the first degree). These early statutes weigh against an interpretation of Section 1 as including an abortion right broad enough to conflict with the abortion restrictions in effect in 1889 and for decades after.

[¶99] These statutes in force after the constitution was adopted are consistent with a narrower self-defense framing of Section 1 as applied to abortion restrictions. These statutes uniformly made an exception for abortion necessary to defend the pregnant woman's life. Although we presume the Legislative Assembly acts consistent with its understanding of the constitution, we do not presume it always legislates to the fullest extent of its constitutional authority. A legislative enactment to prohibit certain conduct is inconsistent with the existence of a right to that conduct, but an enactment declining to prohibit other conduct does not establish that a constitutional right prevented the Assembly from doing so.

[¶100] The longstanding and consistent statutory restrictions tend to show the contemporaneous understanding of the Legislative Assembly. *State ex rel. Heitkamp v. Hagerty*, 1998 ND 122, ¶ 17, 580 N.W.2d 139 (citing *State v. City of Sherwood*, 489 N.W.2d 584, 587 (N.D. 1992) ("A contemporaneous and longstanding legislative construction of a constitutional provision is entitled to significant weight when we interpret the provision.")). We have explained a legislative construction is not binding on the courts, but "when it has been followed by a harmonious and constant course of subsequent legislation which has been in effect and acted upon for a period of years . . . it is entitled to great

weight in determining the real intent and purpose of constitutional provisions and requirements." *State ex rel. McCue v. Blaisdell*, 119 N.W. 360, 364 (N.D. 1909) (citing several cases along with Cooley's Const. Lim. 81). We give special consideration to a contemporaneous legislative construction because the circumstances leading to the constitutional enactment were well known to the legislators and executive branch officials of the time. *See Johnson v. Wells Cnty. Water Res. Bd.*, 410 N.W.2d 525, 529 (N.D. 1987).

6

[¶101] At the time of the adoption of the North Dakota Constitution in 1889, abortion was largely criminalized throughout the United States. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 248–49 (2022). There is no indication the convention delegates or the people who adopted the North Dakota Constitution understood the natural rights to "enjoying and defending life" to implicate abortion when not necessary to preserve life. Section 1 recognized an existing inalienable natural right, but there is no indication it was understood to broaden the existing understanding of natural rights beyond those recognized at common law and exercised consistent with the territorial code.

[¶102] To the extent the newspapers of the state included public discussion of abortion in the years around adoption of the North Dakota Constitution, they do not support an interpretation of Section 1 broadly protective of abortion not necessary to protect the life of the mother. Although many reports of abortion close in time to the adoption of the constitution involved criminal charges following the death of the pregnant woman, the newspaper reports were not limited to abortions that caused death of the pregnant woman. Stay Op., 2025 ND 26, ¶¶ 69–70 (Tufte, J., dissenting).

[¶103] The reported court cases are consistent with the news accounts. Criminal convictions for abortion offenses were appealed to the North Dakota Supreme Court several times soon after statehood. *See, e.g., Reilly*, 141 N.W. at 728; *Moeller*, 138 N.W. 981; *State v. Longstreth*, 121 N.W. 1114 (N.D. 1909); *Belyea*, 83 N.W. at 3. These opinions do not discuss the constitutional status of abortion or suggest natural rights may be implicated. To be sure, a court's silence on claims not

56

raised carries little significance, but as evidence of ordinary meaning, one must consider the defendants would have been highly motivated to raise any available defense, and if the scope of natural rights protected by Section 1 is as broad as claimed by Plaintiffs in this litigation, they would have had strong defenses to prosecution. In *Belyea*, we explained: "The law leaves it for a jury to determine whether or not any miscarriage was necessary to save the life of the pregnant woman, and, if in the judgment of 12 men a miscarriage of the woman was not necessary to save her life, a verdict of guilty may be returned regardless of the motives governing the accused." *Belyea*, 83 N.W. at 3. In *Longstreth*, 121 N.W. 1114, the Court addressed Dr. Longstreth's appeal from a conviction for abortion. The Court divided on whether there was sufficient evidence presented to prove the abortion was not necessary to preserve the life of the woman. *Id.* at 1119. The prosecution had presented testimony from the woman that she had become pregnant by Dr. Longstreth and that he had employed drugs and a medical instrument on her to induce abortion without ever telling her that an abortion was necessary to preserve her life. *Id.* at 1118.

[¶104] The medical treatises and journals cited by the parties provide additional context for how the enacting public would have understood natural rights in relation to abortion. Taken as a whole, these sources do not support the conclusion that practicing physicians or the public at large believed there was a natural right to abortion absent a substantial risk of death or bodily injury. Stay Op., 2025 ND 26, ¶¶ 73–79 (Tufte, J., dissenting). The medical literature is consistent with a natural right to preserve the life of a pregnant woman when her life and physical health would be in grave danger by continuing the pregnancy. In short, abortion was understood to be justified as a last resort if the pregnant woman was likely to die or suffer significant physical harm if the pregnancy continued. Some references suggest there were practitioners who had a broader view of appropriate practice or who flouted the law without fear of prosecution. That appears to be a minority view that carries little weight in understanding the Section 1 natural rights when contrasted with the restrictive legal regime and frequent prosecutions publicized in contemporaneous newspapers. Amicus McDonagh asserts that "every pregnancy, even a medically uncomplicated pregnancy, causes or threatens to cause serious bodily injury,"

thus implicating the asserted right. But there is no support in the historical sources that the enacting public would have understood these natural rights so broadly. Further, none of the references provide any meaningful support for the notion of a natural right to abortion arising from mental health concerns or self-inflicted harm. Given the medical technology of the day, there is also no guidance in the historical sources for a natural right relating to known, serious fetal abnormalities.

7

[¶105] When the constitution declares a pre-existing right, as opposed to granting or creating it, the legal background is particularly significant because it is that background understanding to which the constitution refers. For example, like the inalienable rights all individuals have "by nature," declared in Section 1, the right of trial by jury is declared and secured by Section 13, not granted or created: "*The* right of trial by jury shall be secured to all, and *remain* inviolate." N.D. Const. art. I, § 13 (emphasis added). "This provision preserves the right to a jury trial in all cases in which it could have been demanded as a matter of right at common law at the time of the adoption of our constitution." *Smith*, 2021 ND 131, ¶ 12 (citation omitted). "[T]he framers of the Constitution intended by the adoption of said provision to preserve and perpetuate the right of trial by jury as it existed by law at and prior to the adoption of the Constitution." *Riemers v. Eslinger*, 2010 ND 76, ¶ 8, 781 N.W.2d 632. "The fact that the Constitution secures 'the right of trial by jury' by simply declaring it . . . is significant . . . of an intent to merely perpetuate the right as it then existed and was known to the people who gave to the Constitution their approbation." *Barry v. Truax*, 99 N.W. 769, 771 (N.D. 1904). To determine the scope of such a right, we consider the legal context against in which the provision was adopted, including the codified law of Dakota Territory then in effect and the common law and practices applied by the territorial courts. *Smith*, 2021 ND 131, ¶ 22; *Riemers*, 2010 ND 76, ¶ 10.

[¶106] The language of Article I, Section 1, declares pre-existing rights that all individuals "have"; by its plain language it does not grant new rights. This structural arrangement is confirmed by Section 20: "everything in this article is excepted out of the general powers of government and shall forever remain

inviolate." N.D. Const. art. I, § 20; *State ex rel. Cleveringa v. Klein*, 249 N.W. 118, 124 (N.D. 1933). The term "remain inviolate" presupposes the existing scope of the Article I rights will be preserved unchanged. *See City of Bismarck v. Fettig*, 1999 ND 193, ¶ 11, 601 N.W.2d 247 (emphasizing the word "remain" as signaling a continuation of jury trial rights as defined under territorial law). Thus, the pre-1889 common law and territorial law as it relates to defending life, justification, and obtaining safety are important considerations to understand the scope of the Section 1 natural rights. "[A] lack of government interference throughout history might be some evidence that a right is deeply rooted. But standing alone, it cannot be enough." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 706 (D.C. Cir. 2007). Although we should not reflexively "assume[] that founding-era legislatures maximally exercised their power to regulate, [and] thereby adopt[] a 'use it or lose it' view of legislative authority," *United States v. Rahimi*, 602 U.S. 680, 739–40 (2024) (Barrett, J., concurring), the assumption may be warranted here considering the consistent historical evidence reflecting a strong moral condemnation of abortion in 1889. It is thus likely the Territorial Legislature did maximally regulate abortion.

[¶107] By analogy to our cases preserving the jury trial right as known in 1889, the legislature may not infringe the rights "of enjoying and defending life and liberty" and "pursuing and obtaining safety and happiness" to impair those rights relative to the rights enjoyed by the people of the state when the constitution was adopted. The territorial code is discussed above in III(B)(4). Abortion was not prohibited when it was "necessary to preserve her life." The state had the burden to prove lack of necessity as an element of the offense beyond a reasonable doubt. The central defect in the previous law was making necessity an affirmative defense on which the defendant carried the burden of proof. Injunction Op., 2023 ND 50, ¶ 44 (Tufte, J., concurring). The background legal context shows the legislature could and did prohibit abortion in all circumstances not necessary to save the woman's life. The continuation of these restrictions is strong evidence that the enacting public did not understand Section 1 to alter that arrangement.

[¶108] After concluding that the meaning of the constitution as enacted in 1889 did not recognize the rights asserted by the Plaintiffs, the district court put significant weight on the amendment to Section 1 approved in 1984. The 1984 amendment is the only time Section 1 has been amended. The unmistakable purpose of that amendment, not mentioned by the district court, was to add an express right to keep and bear arms to Section 1. Stay Op., 2025 ND 26, ¶¶ 80–88 (Tufte, J., dissenting). The district court focused on the 1984 amendment's change of "All men" to "All individuals." The court's rationale is not completely clear, but it either concluded that this change from "men" to "individuals" contained a previously-unrecognized gender equality component that included a right to abortion or it simply set aside its conclusions about the meaning of the unamended 1889 language because it "simply cannot conclude . . . that the same view must be taken today." It requires no citation to reject the latter rationale.

[¶109] For completeness, we must consider whether this amendment of "men" to "individuals" altered the meaning of Section 1 in any way material to the Plaintiffs' claims. Plaintiffs did not defend the district court's reliance on the 1984 amendment in their brief, but at oral argument they stopped short of conceding they had abandoned this argument. Although an appellee may defend the judgment on grounds rejected by the district court, *Kalvoda v. Bismarck Pub. Sch. Dist. #1*, 2011 ND 32, ¶ 14, 794 N.W.2d 454, arguments not adequately briefed are generally waived on appeal, *Hoever v. Wilder*, 2024 ND 58, ¶ 7, 5 N.W.3d 544.

[¶110] The change from "All men" to "All individuals" was a non-substantive modernization of language. Stay Op., 2025 ND 26, ¶¶ 80–88 (Tufte, J., dissenting). The women of North Dakota were included within the protections of Section 1 before the amendment, and they remained so with this more modern inclusive phrasing. *See State v. Norton*, 255 N.W. 787, 792 (N.D. 1934) ("We interpret the word 'men' in the thought of the convention and of the people of the day as meaning those persons who possessed the qualifications of jurors at that time, with no thought of sex.").

[¶111] The rest of Section 1, unamended since 1889, continues to carry the same legal meaning since it was enacted. *See State ex rel. Paulson v. Meier*, 127 N.W.2d 665, 673 (N.D. 1964) (explaining "[t]o the extent that [amendment to a statute] reenacts the provisions of the former law, it is a mere continuation of those provisions"); *see also City of Fargo v. Ross*, 92 N.W. 449, 451 (N.D. 1902) (quoting *Gordon v. People*, 44 Mich. 485, 7 N.W. 69 (1880)) ("So far as the section is changed it must receive a new operation, but so far as it is not changed it would be dangerous to hold that the merely nominal re-enactment should have the effect of disturbing the whole body of statutes in pari materia which had been passed since its first enactment."); *Malloy*, 2024 ND 109, ¶ 23 (explaining unamended portion of takings clause continues to have the original 1889 meaning); *State ex rel. Strutz v. Baker*, 299 N.W. 574, 582 (N.D. 1941) (Morris, J., concurring specially) ("The portions of the amended sections which are merely copied without change are not to be considered as repealed and again enacted, but to have been the law all along . . . ."). Accordingly, we must interpret the meaning of the language adopted in 1889 as it was understood at that time and not as if it was newly enacted in 1984.

9

[¶112] Several of our sister states have considered state constitutional claims asserting rights to abortion. These decisions differ in the type of clause asserted, such as privacy, due process, or natural rights. They also differ in their consideration of the unique language of each clause, the different historical circumstances in which each was enacted, and the state's precedent and historical application of the provision. The decisions considering natural rights clauses are potentially relevant to our decision here. Other states' application of clauses guaranteeing privacy rights or due process rights have little relevance to the meaning of Section 1.

[¶113] In a 2023 decision, the Indiana Supreme Court vacated a preliminary injunction against a statute that broadly prohibited abortion with exceptions for life-threatening circumstances, lethal fetal anomalies, and rape or incest. *Members of Med. Licensing Bd. of Indiana v. Planned Parenthood*, 211 N.E.3d 957 (Ind. 2023). The court interpreted Article 1, Section 1 of the Indiana Constitution,

which "DECLARE[S], That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness." *Id.* at 967. The court concluded this provision protects a woman's right to abortion only when necessary to protect her life or from a serious health risk. *Id.* at 975–76. The court explained the inalienable right to life was firmly established long before Indiana became a state in 1851. *Id.* at 976. The court rejected the broader claim that this provision guarantees a fundamental right to abortion in all circumstances, concluding that while the constitutional provision is judicially enforceable, historical evidence shows that Indiana's framers understood it to leave the legislature with broad discretion to regulate abortion. Because the statute can be enforced consistent with Article 1, Section 1 in at least some circumstances, the court found that the plaintiffs failed to show a reasonable likelihood of success on their facial challenge. *Id.* at 984.

[¶114] In 2023, the Oklahoma Supreme Court upheld a statute prohibiting abortion "unless the same is necessary to preserve her life" against constitutional challenge under the state constitution's inherent rights clause. *Oklahoma Call for Reproductive Justice v. Drummond*, 2023 OK 24, ¶¶ 8–9, 526 P.3d 1123, 1130. The Oklahoma Constitution provides: "All persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry." Okla. Const. art. II, § 2. Relying on the state's long history of outlawing abortion unless necessary to save the pregnant woman's life, the court concluded the inherent right to life protects a right to terminate pregnancy when necessary to preserve the woman's life. *Drummond*, 2023 OK 24, ¶ 9. The court defined the inherent right to be implicated "if at any point in the pregnancy, the woman's physician has determined to a reasonable degree of medical certainty or probability that the continuation of the pregnancy will endanger the woman's life due to the pregnancy itself or due to a medical condition that the woman is either currently suffering from or likely to suffer from during the pregnancy. Absolute certainty is not required; however, mere possibility or speculation is insufficient." *Id.* ¶ 9. The court applied strict scrutiny to uphold the state's pre-*Roe* ban with an adequate exception, while striking down a 2021 criminal

abortion ban given that its medical exception required life to be in "actual and present danger." *Id.* ¶ 16.

[¶115] In *Planned Parenthood Great Northwest v. State*, 522 P.3d 1132 (Idaho 2023), the Idaho Supreme Court held that the Idaho Constitution does not implicitly guarantee a fundamental right to abortion. The court's analysis primarily focused on the Inalienable Rights Clause of the Idaho Constitution, which states: "All men are by nature free and equal, and have certain inalienable rights, among which are enjoying and defending life and liberty; acquiring, possessing and protecting property; pursuing happiness and securing safety." *Id*. at 1167–68. Petitioners argued that this clause, along with other provisions, implicitly protects rights to "privacy," "bodily autonomy," and "intimate familial decisions," which encompass the right to abortion. The court explained that "inalienable rights, which are not expressly guaranteed, may nevertheless be implicitly protected as 'fundamental rights' within the Inalienable Rights Clause if the particular right is shown to be so rooted in the traditions and conscience of Idaho so as to be ranked fundamental." *Id*. at 1174. After considering preexisting territorial laws, the records of the state constitutional convention, and related statutes and common law, the court concluded that a right to abortion was not "deeply rooted" in Idaho's history and traditions. *Id*. The court concluded that the challenged abortion statutes passed rational basis review and were not unconstitutional under the Idaho Constitution. *Id*. at 1196–97.

[¶116] In 1982, the New Jersey Supreme Court held that the right to abortion is fundamental under the New Jersey Constitution's natural rights guarantee. *Right to Choose v. Byrne*, 450 A.2d 925, 933 (1982) (interpreting provision: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."). The New Jersey Supreme Court interprets its natural rights guarantee as including a right to privacy, and has analyzed abortion claims as violating the state constitution's equal protection guarantee by treating differently those women who seek an abortion from those who decide to carry to term. *Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620, 632 (2000).

[¶117] In 2019, the Kansas Supreme Court interpreted Section 1 of the Kansas Constitution Bill of Rights to protect a right to abortion. *Hodes & Nauser v. Schmidt*, 440 P.3d 461 (Kansas 2019). The court concluded a statutory ban on abortions by dilation and evacuation was unconstitutional under Section 1, which provides: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Conducting a lengthy and thorough analysis of Kansas history, the court determined that the constitution's natural rights guarantee protects "personal autonomy," which is "the heart of human dignity" and "encompasses our ability to control our own bodies, to assert bodily integrity, and to exercise self-determination." *Id*. at 497. The court determined that this fundamental right requires the application of strict scrutiny, meaning the State can restrict it only if it has a compelling interest and the restriction is narrowly tailored to that interest. *Id*. at 495–96. The court concluded that the abortion providers had demonstrated a substantial likelihood of prevailing on their claim that the Act unconstitutionally infringes upon this right by severely limiting access to the safest procedure for second-trimester abortions. *Id*. at 501.

[¶118] In 2024, a minority of the Pennsylvania Supreme Court considered, as a matter of first impression, whether the Pennsylvania Constitution guarantees a right to abortion. *Allegheny Reprod. Health v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 898–99 (Pa. 2024). At issue in *Allegheny* was the state's ban on Medicaid payments for abortions in non-life-threatening situations, and a majority of the court held that the ban violated the state constitution's equal rights amendment. *Id.* at 852, 891. Two of the five participating justices also reached the question of whether the state constitution guarantees a right to reproductive autonomy, while the remainder of the court concluded the case did not properly present the issue of whether there is an abortion right under the state constitution. *Id.* at 892 n.84, 989 (Todd, C.J., concurring and dissenting), 997 (Dougherty, J., concurring and dissenting), 998 (Mundy, J., concurring and dissenting). Because the right to abortion in Pennsylvania "was firmly ensconced in the federal Constitution, there ha[d] been no opportunity to address the question of whether [the Pennsylvania] Constitution protects the right to make decisions involving reproductive autonomy until *Dobbs*, when the federal right was retracted." *Id.* at

64

906. The two justices who considered the issue grounded their analysis on Article I, Section 1 of the Pennsylvania Constitution—titled "Inherent rights of mankind"—which provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1. Relying on the court's privacy jurisprudence, rooted in the inherent rights provision as well as constitutional search and seizure protections, they concluded that an abortion right inheres in the right to privacy, which they defined as "the inherent right of an individual to be let alone—to live a private life, to have security in one's bodily integrity and to make important decisions free of government intrusion." *Allegheny*, 309 A.3d at 906. They elaborated that "Article I rights are inherent," and the court is thus "not constrained, as the *Dobbs* Court believed it was, to determine whether abortion is 'deeply rooted' in the 'history or traditions' of the Commonwealth. . . . It is, however, helpful to clarify the status of abortion in Pennsylvania." *Id.* They concluded that, at the time the state "Charter was adopted, abortions were available and performed and the government did not interfere in a woman's pregnancy until quickening," *i.e.*, "the first perception of a fetal movement by a pregnant woman herself," which "generally occurred near the midpoint of gestation, late in the fourth or early in the fifth month." *Id.* at 907, 909.

[¶119] Other states applying rights guaranteed by their state constitutions have applied provisions distinctly different in their text and enacted in circumstances far removed from the context of our 1889 provision. *See Hope Clinic v. Flores*, 2013 IL 112673, 991 N.E.2d 745 (relying on due process and equal protection provisions it interpreted in lockstep with the United States Constitution); *Moe v. Sec'y of Admin. & Fin.*, 417 N.E.2d 387, 397 (Mass. 1981) (relying on guarantee of due process); *Women of the State of Minn. ex rel. Doe v. Gomez*, 542 N.W.2d 17, 31 (Minn. 1995) (relying on right to privacy implied in due process and search and seizure clauses); *Pro-Choice Mississippi v. Fordice*, 716 So.2d 645, 653 (Miss. 1998) (relying on right to privacy implied in state constitution's Ninth Amendment analogue); *Armstrong v. State*, 1999 MT 261, ¶ 39, 989 P.2d 364 (relying on personal autonomy component of fundamental right of individual privacy);

*Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997) (relying on right to privacy).

10

[¶120] The rights guaranteed by Article I, Section 1, are those natural rights as they were known to the people of North Dakota at the time the constitution was adopted. These natural rights were fixed at that time, and our judicial duty is to ensure that they "shall not be infringed." These rights are protected from legislative overreach because they are excluded from the state's broad legislative power.

[¶121] On the basis of the above consideration of the language of Section 1 in light of all of our traditional interpretive rules and references, including evidence of its ordinary meaning, the legal context, and the contemporaneous applications, the natural rights that every North Dakota citizen has "by nature" include an individual right to seek medical care without risk of criminal prosecution, including but not limited to abortion, when reasonably necessary to preserve the individual's life. The natural right fixed by Section 1 extends to prevention of physical injury of similar seriousness as the serious bodily injury the enacting public understood would give rise to justified use of deadly force in self-defense. Section 1 does not imply a right to abortion as such, and evolving public opinion on abortion cannot create one—only a constitutional amendment can do that. *State ex rel. Gaulke v. Turner*, 164 N.W. 924, 936 (N.D. 1917) ("When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the Legislature, we cannot declare a limitation, under the notion of having discovered something in the spirit of the Constitution which is not even mentioned in the instrument."). Section 1 limits state power to regulate abortion where it is a necessary means to the constitutionally protected end of "defending life."

11

[¶122] Having considered the scope of the Section 1 rights, we now consider each provision of the statute that the Plaintiffs argue conflicts with rights guaranteed by Section 1. If the statute infringes a fundamental right, strict

66

scrutiny applies. *Hoff v. Berg*, 1999 ND 115, ¶ 16, 595 N.W.2d 285. If not, then our review is much more restrained. *Ferguson v. City of Fargo*, 2016 ND 194, ¶ 9, 886 N.W.2d 557.

[¶123] **Physical conditions and delay.** The statute provides an exception for "An abortion deemed necessary based on reasonable medical judgment which was intended to prevent the death or a serious health risk to the pregnant female." N.D.C.C. § 12.1-19.1-03(1). "'Serious health risk' means a condition that, in reasonable medical judgment, complicates the medical condition of the pregnant woman so that it necessitates an abortion to prevent substantial physical impairment of a major bodily function, not including any psychological or emotional condition." N.D.C.C. § 12.1-19.1-01(5). Self-inflicted harm is not within the exception. *Id.* Plaintiffs argue the statute requires physicians to delay care until the patient develops a serious, avoidable infection. This argument conflates "serious" with "imminent." One may have a serious condition such as an early cancer diagnosis that may not yet substantially impair any bodily function, yet still clearly be within reasonable medical judgment that treatment is required to save the patient's life or avoid the serious health risk that any reasonable practitioner understands is to be expected in the natural progression of the condition. The question is whether reasonable medical judgment would conclude there is a probability as opposed to a mere possibility that an abortion would prevent serious physical injury. Section 1 protects an individual's right to defend her life using abortion as a means of preventing probable, not merely possible or conceivable harm. The statute's definition of serious health risk is consistent with a woman's Section 1 right to defend her life and avoid serious physical injury, and for a qualified physician to assist her in exercising that right.

[¶124] **Mental health conditions**. Plaintiffs also argue the legislature's failure to exclude abortions intended to alleviate or avoid mental health conditions renders it facially unconstitutional. The legislation defines "serious health risk" as "not including any psychological or emotional condition." N.D.C.C. § 12.1-19.1-01(5). The historical context discussed above overwhelmingly shows the Section 1 rights to "defending life" and "obtaining safety" do not encompass abortion as a means to alleviate mental health conditions. Plaintiffs argue that mental health and physical health conditions may be intertwined. If a

psychological condition is intertwined with a physical malady sufficient to constitute a "serious health risk," the statutory exception would apply without regard to any co-occurring psychological condition. Neither the statute's omission of mental health conditions nor the omission of self-harm implicates Section 1 rights. There is no basis on which we could conclude the ordinary meaning of Section 1 was understood to protect abortion under those circumstances. Accordingly, the statute does not implicate the scope of the Section 1 rights and strict scrutiny does not apply. Plaintiffs do not argue the failure to permit mental health abortions is arbitrary or would otherwise fail rational basis scrutiny. The statute has not been shown to be unconstitutional on this basis.

[¶125] **Fatal or life-limiting fetal conditions**. Plaintiffs argue some pregnancies involve fetal conditions that are "fatal or life-limiting, meaning 'there is little or no possibility that the fetus will survive until delivery and sustain life after birth without aggressive and oftentimes futile intervention.'" There is nothing in the record that suggests medical technology permitted doctors to anticipate such conditions in 1889, so there is no reason to think the enacting public had any basis to understand natural rights to be implicated in such situations. This situation illustrates the importance of framing what legal rule or principle is embodied in Section 1 so that we may apply it to factual circumstances that could not have been anticipated when the law was adopted as part of the constitution. Framing the relevant right as stated above, as a right to defend one's life from probable serious bodily injury or death, permits us to consider how the legal meaning of Section 1 may apply to fetal conditions known only to modern technology.

[¶126] Every policy choice enacted into statute requires some line-drawing. The Legislative Assembly chose not to permit abortion on the basis of a reasonable medical judgment that the baby will likely not survive until birth or may require aggressive and uncertain intervention. No matter how important or personally compelling that situation may seem to individual judges, the power to permit or prohibit abortion in such situations lies with the legislature, or the people through ballot initiative. Plaintiffs' arguments rely on the emotional pain that results from stillbirth or watching a newborn baby suffer and die. Such harms

fall within the exclusion for psychological or emotional conditions. The rights guaranteed by Section 1 do not extend to abortion as a means to prevent such harms. In contrast, where reasonable medical judgment tells us that a fetal condition will progress to a serious health condition threatening the pregnant woman, that situation is covered by the "serious health risk" discussion above.

C

[¶127] Plaintiffs also argue that the statute is unconstitutionally vague under Article I, Section 12. Plaintiffs' vagueness claim derives from the Section 12 guarantee of due process: "No person shall . . . be deprived of life, liberty or property without due process of law."

[¶128] As presented here, the vagueness claim is one of first impression. Before this litigation, no previous decision of this Court considered an independent state constitutional claim asserting a statute was void for vagueness. Our decisions consistently cite both the state and federal due process provisions and analyze vagueness with reference to U.S. Supreme Court doctrine under the Fourteenth Amendment without any suggestion that Section 12 may be amenable to different analysis. *Interest of D.D.*, 2018 ND 201, ¶ 7, 916 N.W.2d 765; *State v. Holbach*, 2009 ND 37, ¶ 24, 763 N.W.2d 761; *Judicial Conduct Commission v. McGuire*, 2004 ND 171, ¶ 19, 685 N.W.2d 748; *State v. Beyer*, 441 N.W.2d 919 (N.D. 1989); *State v. Johnson*, 417 N.W.2d 365 (N.D. 1987); *Olson v. City of West Fargo*, 305 N.W.2d 821 (N.D. 1981); *Interest of E.B.*, 287 N.W.2d 462 (N.D. 1980); *State v. Woodworth*, 234 N.W.2d 243 (N.D. 1975); *In re J.Z.*, 190 N.W.2d 27 (N.D. 1971) (superseded by rule on other grounds). In one decision, this Court rejected an attempt to "suggest some difference between the state and federal constitutions" in application of a vagueness challenge, describing the attempt as "not an argument of law" because whether "reasonable noise" is different in a small town compared to the United States as a whole is a question for the fact finder. *City of Belfield v. Kilkenny*, 2007 ND 44, ¶ 12, 729 N.W.2d 120. Because Section 12 has language nearly identical to the due process clause of the Fourteenth Amendment, our cases have long analyzed the clauses in parallel. Here we have no reasoned argument that we should apply different vagueness analysis under the purely state claim, so the discussion below assumes without deciding that

the due process protections guaranteed by Section 12 are coextensive with those protected by the Fourteenth Amendment.

1

[¶129] The district court correctly rejected the Plaintiffs' framing of their challenge as an "as-applied challenge supported by speculative facts." By granting summary judgment, the court properly concluded this is a facial challenge that does not depend on any adjudicative facts for resolution. But the court then misapplied our law for facial challenges. We recently summarized our jurisprudence on constitutional challenges:

> "Challenges to the constitutionality of a statute may be 'facial' challenges or 'as-applied' challenges." *State v. Anderson*, 2022 ND 144, ¶ 7, 977 N.W.2d 736. "A claim that a statute on its face violates the constitution is a claim that the Legislative Assembly exceeded a constitutional limitation in enacting it, and the practical result of a judgment declaring a statute unconstitutional is to treat it 'as if it never were enacted.'" *SCS Carbon Transp. LLC v. Malloy*, 2024 ND 109, ¶ 7, 7 N.W.3d 268 (quoting *Anderson*, at ¶ 7). "An 'as-applied' challenge, on the other hand, is a claim that the constitution was violated by the application of a statute in a particular case." *Id.* at ¶ 8. "Generally, a party may only challenge the constitutionality of a statute as applied to that party." *Id.* (quoting *Anderson*, at ¶ 7).

> "[W]hen both an as-applied challenge and a facial challenge are raised, we generally first consider the narrower as-applied challenge." *SCS Carbon Transp.*, 2024 ND 109, ¶ 8. "As a general rule a court will inquire into the constitutionality of a statute only to the extent required by the case before it and will not anticipate a question of constitutional law in advance of the necessity of deciding it, and will not formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Anderson*, 2022 ND 144, ¶ 11 (quoting *State v. King*, 355 N.W.2d 807, 809 (N.D. 1984)); *see also Sorum v. State*, 2020 ND 175, ¶ 21, 947 N.W.2d 382 (stating "[a] facial challenge to a statute presents a higher bar than an as-applied challenge"); *State v. Morris*, 331 N.W.2d 48, 58 (N.D. 1983) ("If the statute as applied to

70

[appellant] is constitutional, he will not be heard to say that it is unconstitutional as applied to others.").

*City of Fargo*, 2024 ND 236, ¶¶ 11–12.

[¶130] This is a facial challenge to a criminal statute, N.D.C.C. ch. 12.1-19.1. Plaintiffs have not been subject to enforcement proceedings; they assert only prospective future conduct. Plaintiffs do not assert the challenged statute implicates rights protected by the First Amendment to the U.S. Constitution. It is long established in our jurisprudence, consistently applied outside the First Amendment context, that we will not entertain a pre-enforcement facial challenge asserting a statute is void for vagueness based on "various hypothetical situations." *State v. Schwalk*, 430 N.W.2d 317, 321 n.1 (N.D. 1988); *see State v. Tibor*, 373 N.W.2d 877 (N.D. 1985).

[¶131] Pre-enforcement facial vagueness challenges are allowed in the First Amendment context because U.S. Supreme Court doctrine creates a buffer zone around these rights to avoid a chilling effect on certain constitutionally protected activity. *United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (explaining overbreadth doctrine is justified because "it provides breathing room for free expression" from laws that "may deter or 'chill'" free speech). Outside the First Amendment context, we have not applied overbreadth doctrine or the chilling effect doctrine to invalidate a statute.[3] Were we to permit pre-enforcement challenges premised on hypothetical future conduct here or in other non-First Amendment contexts, every statute would be vulnerable to challenge on the basis of contrived hypotheticals reminiscent of law school exam questions

---

[3] The majority opinion cites several cases for the proposition that stricter vagueness applies to guard against a chilling effect, but all consider only First Amendment claims. Majority, ¶ 30. Overbreadth and chilling effect are closely related and are strong medicine we should not lightly expand beyond First Amendment free speech rights where doctrine recognizes that harmful speech is often countered by more speech in response. *See United States v. Alvarez*, 567 U.S. 709, 727 (2012) ("The remedy for speech that is false is speech that is true."). "[I]nvalidation of legislation under the overbreadth doctrine is 'manifestly, strong medicine' which should be used 'sparingly and only as a last resort,' and . . . 'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" *City of Fargo v. Salsman*, 2009 ND 15, ¶ 25, 760 N.W.2d 123.

specifically crafted to test the limits of a statute. Every criminal statute necessarily demarcates permissible and impermissible conduct. "There is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be a nice question. The [objective], however, is not . . . [the] wholly consistent academic definition of abstract terms." *Olson*, 305 N.W.2d at 829. If the Court were to generally permit facial challenges premised on hypothetical scenarios, it would eliminate rational basis review as a practical matter because unless a regulation contains every exception the court or a creative litigant can dream up, it will be facially unconstitutional for all purposes. *See Planned Parenthood v. Reynolds*, 975 N.W.2d 710, 736 (Iowa 2022) (describing this as "rational basis deference in reverse").

[¶132] The Plaintiffs argue that the statute is vague in some hypothetical scenarios and, as a result, ask us to declare it facially invalid for all scenarios. Where a facial challenge concerns a criminal statute, the U.S. Supreme Court has recently repeated that the statute will be upheld unless there is no set of circumstances in which the statute could be constitutionally applied. *Rahimi*, 602 U.S. at 693 (upholding ban on firearm possession by those subject to restraining order because "the Government need only demonstrate that Section 922(g)(8) is constitutional in some of its applications"); *City of Chicago v. Morales*, 527 U.S. 41 (1999); *United States v. Salerno*, 481 U.S. 739 (1987). Our decisions casting doubt on *Salerno*'s "no set of circumstances" standard for facial challenges arose in the context of equal protection and takings challenges to non-criminal statutes. *Aamodt*, 2018 ND 71, ¶ 38 (rejecting equal protection challenge in a single conclusory paragraph, reasoning that for claims under the challenged damages cap (*i.e.*, when the cap did not apply), there was no differential treatment between claims and a constitutional application sufficient under *Salerno*); *Sorum*, 2020 ND 175, ¶¶ 22–24 (rejecting application of *Salerno* standard under gift clause challenge where statute required payment of both lapsed and enforceable claims); *Nw. Landowners Ass'n*, 2022 ND 150, ¶¶ 13–15 (rejecting application of *Salerno* to defeat facial challenge where the statute completed an unconstitutional taking as to some landowners despite application to other landowners not resulting in a taking).

72

[¶133] Our vagueness decisions have always followed enforcement action, and before considering facial invalidity, we have uniformly required a challenger to first demonstrate that the statute is unconstitutionally vague as to their own conduct—specifically past conduct, not hypothetical future conduct. "In order to invalidate an entire statute for vagueness, however, the statute must be vague in all its applications." *Best Prods. Co.*, 461 N.W.2d at 100 (applying same analysis to "due process clauses of the state and federal constitutions" and citing *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982)). "Many of the sections . . . use terms that are understandable to judges, juries, . . . and police officers. It cannot be said, therefore, that the statute is vague in all its applications. Because this statute is not vague in all its applications and because challengers are not themselves being prosecuted for allegedly vague applications of the law, Challengers' argument fails." *Best Prods. Co.*, 461 N.W.2d at 100; *Tibor*, 373 N.W.2d at 881 ("Tibor has no standing to challenge [the statute] as being void for vagueness. [The statute] does not regulate or proscribe speech protected by the first amendment, and Tibor has not shown [it] to be impermissibly vague in all of its applications."). *See also Johnson v. United States*, 576 U.S. 591, 595 (2015) (concluding residual clause of Armed Career Criminal Act was void in its application to Johnson's conviction for unlawful possession of a short-barreled shotgun and also facially vague); *Flipside*, 455 U.S. at 495 ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law."). "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000). "As always, enforcement requires the exercise of some degree of police judgment." *Id.* "In this context, the court must determine whether the statute can ever be applied in a valid manner." *Planned Parenthood of Minn. v. State of Minn.*, 910 F.2d 479, 483 (8th Cir. 1990) (citing *Salerno*, 481 U.S. at 745).

> The delicate power of pronouncing a [legislative act] unconstitutional is not to be exercised with reference to hypothetical cases. . . . [A] limiting construction could be given to the statute by

73

the court responsible for its construction if an application of doubtful constitutionality were . . . presented. . . . The strong presumptive validity that attaches to [a legislative act] has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.

*Id.* at 485.

[¶134] The majority opinion offers no limiting construction, only a rejection of the statute without offering an interpretation of the constitutional right against which it would measure future legislation.[4] Because the Plaintiffs have presented only hypothetical scenarios and have not demonstrated the statute is vague as applied to any actual conduct, their facial challenge fails to satisfy our established precedent. Outside the First Amendment, no precedent of this Court or the U.S. Supreme Court supports a declaration that a criminal statute is facially void for vagueness without first concluding the statute is vague in the circumstances present in that case.[5] We should not do so here.

[¶135] Plaintiffs have argued a constitutional standard for facial challenges that could not apply to other Section 1 claims. They ask us to declare Chapter 12.1-19.1, N.D.C.C., void for vagueness on the basis of uncertainty in hypothetical edge cases. They posit that because the application of statutory exceptions might

---

[4] Even limiting this more stringent vagueness challenge to this Section 1 right is unworkable because the asserted right is bound together with the other Section 1 rights by the concluding phrase ensuring they "shall not be infringed." If the Plaintiffs' hypothetical scenarios demonstrate this statute infringes the natural right of defending life, other hypothetical scenarios will be devised to invalidate statutes implicating the Section 1 right of "acquiring, possessing and protecting property" and the right to "keep and bear arms," among others.

[5] I disagree with my colleagues that *Colautti v. Franklin*, 439 U.S. 379 (1979), is to the contrary or that *Dobbs* overruled its ultimate holding "but not the reasoning," Majority, ¶ 23, n.1. In my view, *Colautti's* application of chilling effect doctrine and other heightened scrutiny borrowed from the First Amendment is an example of a "major distortion in the Court's constitutional jurisprudence," *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 814 (1986) (O'Connor, J., dissenting), that *Dobbs* overruled. *Dobbs*, 597 U.S. at 286 (explaining the "distortion" of legal doctrines caused by *Roe* and *Casey* supported overruling those cases and citing *Thornburgh*, 476 U.S. at 814).

be uncertain in carefully constructed hypothetical scenarios, the entire statute prohibiting abortion is facially void for vagueness. Our precedent does not permit that conclusion, and for good reason. Difficult hypothetical scenarios could be constructed for nearly every criminal offense subject to a recognized defense or exception, including claims of self-defense implicating the Section 1 right of "defending life." For example, one is guilty of aggravated assault if one willfully causes serious bodily injury to another. N.D.C.C. § 12.1-17-02(1)(a). While the definition of "serious bodily injury" has been upheld against vagueness challenges, defendants often raise self-defense as a justification, which requires a determination of whether the use of force was "necessary" and "reasonable under the circumstances." Just as the potential for disagreement or difficulty in applying the "necessity" or "reasonableness" standards of self-defense in complex, hypothetical fact patterns would not render the entire aggravated assault statute unconstitutionally vague, potential difficulty in applying the exceptions here does not invalidate the core prohibition. *But see* Majority, ¶¶ 33–45. The prohibition of abortion, before considering the statutory exceptions, is readily understandable. Because Plaintiffs have presented only hypothetical future conduct outside the First Amendment context, our precedent does not permit this pre-enforcement facial challenge. Plaintiffs have offered no persuasive argument for deviating from our prior cases to allow this pre-enforcement facial vagueness challenge.

2

[¶136] As discussed above, we have said in the context of likely success on the merits that the natural rights protected by Section 1 include by necessary implication a right to abortion when necessary to preserve life or avoid severe physical injury. *See* Injunction Op., 2023 ND 50, ¶ 31 ("severe, life altering damage"). If, contrary to the discussion in the previous section but consistent with the majority opinion, we extend our law to permit the pre-enforcement vagueness challenge on hypothetical facts, we must determine what standard for vagueness applies. We must determine whether this statute is vague in a way that implicates activity within the scope of the right as discussed above. *See State v. Anderson*, 427 N.W.2d 316, 319 n.1 (N.D. 1988) ("One area in which significant countervailing policies have been found is within the context of First

Amendment rights, and facial challenges based upon overbreadth and void-for-vagueness have been permitted in freedom of speech and association challenges under the First Amendment."). *Flipside* explains that not every law implicating speech receives a more stringent vagueness standard; rather, the court must first determine whether the speech at issue is a type of speech not protected by the First Amendment, such as "speech proposing an illegal transaction, which a government may regulate or ban entirely." 455 U.S. at 496. A law that "does not reach constitutionally protected conduct" may still be challenged as vague, but the challenger "must demonstrate that the law is impermissibly vague in all of its applications." *Id.* at 497. The same applies here: not every statute implicating abortion implicates protected activity unless one concludes all abortion is constitutionally protected. By broadly describing the right as "life and health preserving medical care" and failing to anchor it in the context of its enactment, the majority opinion invites strict scrutiny upon the vast range of medical care that might be described as life or health preserving. As in *Flipside*, the court must first determine whether the challenged regulation implicates *protected* activity. Because it does not interpret the scope of the right, the majority opinion fails to explain how this statute reaches constitutionally protected activity. Resolution of this question is necessary before applying strict scrutiny to a statute alleged to infringe the right.

[¶137] "[T]he most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Flipside*, 455 U.S. at 499. The interpretation of Section 1 described above tells us whether higher clarity is required of this statute. The statute challenged here prohibits abortion only in circumstances that are outside the scope of the right of "defending life" and "obtaining safety." The majority opinion's higher specificity requirement for any vagueness challenge asserting a constitutionally protected right would implicate a wide range of statutes, including every criminal statute subject to self-defense (under Section 1 "defending life"), every firearm regulation (under Section 1 right to "keep and bear arms"), every occupational licensing scheme (under Section 7 right to "be free to obtain

employment"), and beyond to other express rights and implied rights such as the right to travel and right to parent one's children. We did not apply a more stringent vagueness test when we considered a vagueness challenge implicating the "fundamental natural right of a parent . . . [which] has been recognized to be of constitutional dimension." *In re J.Z.*, 190 N.W.2d at 29, 35–36 (rejecting vagueness challenge to "without proper parental care or control") (superseded by rule on other grounds). There is no reason consistent with our constitutional doctrine why we should apply such a standard only to abortion, and application of heightened specificity for all constitutional rights would overturn decades of vagueness precedent.[6]

---

[6] Under the Supremacy Clause and vertical stare decisis, we are bound by the strict vagueness test when a void for vagueness claim is brought under the Due Process Clause of the Fourteenth Amendment and challenges a statute implicating First Amendment rights. If it received four votes, the majority opinion would extend that doctrine in two respects. First, it would adopt it as doctrine for challenges brought under Article 1, Section 12. Second, it would extend it to challenges against any statute implicating rights guaranteed by Section 1, and "other fundamental right[s]." Majority, ¶¶ 31–32. The natural rights guarantees under Section 1 include such rights as "defending life," "protecting property," and "to keep and bear arms."

The majority opinion does not limit its logic to medically necessary abortion. Structurally, these Section 1 rights are parallel: they "shall not be infringed." The logic of the majority opinion would require application of a very stringent vagueness test under which expert disagreement about hypothetical applications of a law would be sufficient to void a statute in all circumstances at least until the next biennial legislative session. Majority, ¶ 11.

For example, suppose a person is charged with felony child abuse and asserts a defense under N.D.C.C. § 12.1-05-05, which provides: "a parent . . . or person acting at the direction of [the parent] . . . may use reasonable force upon the minor for the purpose of safeguarding or promoting the minor's welfare . . . . The reasonable force used may not create a substantial risk of death, serious bodily injury, disfigurement, or gross degradation." *See Simons v. State*, 2011 ND 190, ¶ 11, 803 N.W.2d 587. Terms like "reasonable," "substantial risk," and "gross degradation" are inherently imprecise, and since parental rights are constitutional in nature, under the logic of the majority opinion, such imprecision requires facial invalidation of the child abuse statute under its elevated vagueness test.

This analogy demonstrates why extending heightened vagueness scrutiny beyond First Amendment contexts would be problematic. Many criminal statutes implicate to some degree a constitutional right (including life, liberty, property, self-defense, bearing arms, and parental rights) and contain terms requiring case-by-case application. Under the standard stated in the majority opinion, these criminal laws would be vulnerable to facial challenges based on carefully constructed hypothetical scenarios, effectively eliminating rational basis review and making legislative drafting nearly impossible.

[¶138] Our ordinary, non-First Amendment standard for vagueness challenges is as follows. "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Woodworth*, 234 N.W.2d at 246 (quoting *State v. Hipp*, 213 N.W.2d 610, 615 (Minn. 1973)). "A law is not unconstitutionally vague if: (1) the law creates minimum guidelines for the reasonable police officer, judge, or jury charged with enforcing the law, and (2) the law provides a reasonable person with adequate and fair warning of the prohibited conduct." *State v. Moses*, 2022 ND 208, ¶ 17, 982 N.W.2d 321. "[T]he more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kilkenny*, 2007 ND 44, ¶ 11 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)); *State v. Hatch*, 346 N.W.2d 268, 273 (N.D. 1984) (same).

[¶139] Minimum guidelines guard against "arbitrary and discriminatory enforcement." *Interest of D.D.*, 2018 ND 201, ¶ 7 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)); *Johnson*, 417 N.W.2d at 368 (rejecting vagueness argument that statute gave law enforcement "arbitrary discretion in determining what constitutes a violation"). "[A] vague law delegates basic policy matters to those who apply the law, allowing the law to be applied on an ad hoc and subjective basis." Stay Op., 2025 ND 26, ¶ 16 (quoting *Holbach,* 2009 ND 37, ¶ 24); *Tibor*, 373 N.W.2d at 880. "The requisite of definiteness demands no more than a reasonable degree of certainty." *Woodworth*, 234 N.W.2d at 246. "Words or phrases which might be indefinite in one of their possible senses will not invalidate the statute where they have a well settled common-law or technical meaning which can be employed." *Id.* "Where a statutory offense corresponds to a common-law offense, it is sufficiently certain without any definition, since the common-law definition may be employed even in a jurisdiction which has no common-law offenses as such." *Id.*; *Kilkenny*, 2007 ND 44, ¶¶ 13–17 (explaining "we expect law enforcement, judges, and juries to weigh numerous factors all the time" and no objective measurement or "scientific[] test" is required).

78

[¶140] Vagueness is considered from the perspective of a reasonable person subject to the law. *Simons v. State, Dep't of Hum. Servs.*, 2011 ND 190, ¶ 31, 803 N.W.2d 587 ("The statute need not set out in explicit detail all possible factual scenarios that would fall within its reach; it need only give adequate and fair warning, when measured by the common understanding and practice of a 'reasonable person,' of the proscribed conduct."); *State v. Tranby*, 437 N.W.2d 817, 821 (N.D. 1989) (rejecting vagueness challenge to negligent homicide statute, reasoning the law could be fairly administered because a "gross deviation from acceptable standards of conduct" is analogous to the standard of reasonable care, a much-used legal test).

3

[¶141] **Serious Health Risk Exception.** The Plaintiffs argue the entire statute is void for vagueness because physicians disagree about the "serious health risk" exception. The statute's prohibition on abortion "does not apply to . . . [a]n abortion deemed necessary based on reasonable medical judgment which was intended to prevent the death or a serious health risk to the pregnant female." N.D.C.C. § 12.1-19.1-03(1). The Plaintiffs contend the terms "deemed necessary," "reasonable medical judgment," and "serious health risk" are each unconstitutionally vague, and the definition read as a whole is unconstitutionally vague due to overlapping subjective and objective standards.

> "Serious health risk" means a condition that, in reasonable medical judgment, complicates the medical condition of the pregnant woman so that it necessitates an abortion to prevent substantial physical impairment of a major bodily function, not including any psychological or emotional condition. The term may not be based on a claim or diagnosis that the woman will engage in conduct that will result in her death or in substantial physical impairment of a major bodily function.

N.D.C.C. § 12.1-19.1-01(5).

[¶142] As a whole, this statute provides minimum guidelines for officers, judges, and juries to facilitate fair administration and enforcement. A statute's

use of generalized language is insufficient to establish unconstitutional vagueness. Stay Op., 2025 ND 26, ¶ 20; *Olson*, 305 N.W.2d at 828.

[¶143] As to "serious health risk," this Court rejected a vagueness challenge to the similar terms "serious bodily injury" and "substantial bodily injury" in the context of a criminal prosecution for a Class C Felony (the same offense classification at issue here). *State v. Montplaisir*, 2015 ND 237, ¶¶ 27–28, 869 N.W.2d 435. We also rejected a vagueness challenge to the statutory term "substantial." *State v. Motsko*, 261 N.W.2d 860, 865 (N.D. 1977) ("As used in Section 12.1-18-04, it means 'significant,' 'important,' or 'real,' as distinguished from 'insignificant,' 'trivial,' 'nominal,' or 'imaginary.'"). As to "deemed necessary," the Plaintiffs' argument—that doctors may reach different conclusions about what the term means—is insufficient to show it lacks the minimum guidelines required for fair administration and enforcement. *See In re J.Z.*, 190 N.W.2d at 36 (rejecting claim that "proper parental care or control" is unconstitutionally vague). Some discretion is inherent in administration and enforcement of the law—what vagueness doctrine prohibits is such broad discretion that arbitrary and discriminatory enforcement will follow. *Gonzales v. Carhart*, 550 U.S. 124, 150 (2007) (quoting *Kolender*, 461 U.S. at 358) (rejecting arbitrary enforcement argument in vagueness challenge where "[i]t cannot be said that the Act vests virtually complete discretion in the hands of law enforcement to determine whether the doctor has satisfied its provisions" (cleaned up)); *Morales*, 527 U.S. at 61, 63 (concluding statute was void for vagueness where anti-loitering statute gave a "vast amount of discretion" in its enforcement); *Thorburn v. Austin*, 231 F.3d 1114, 1121 (8th Cir. 2000) ("Police officers will have to use discretion to determine whether an activity is picketing and whether it is focused, but enforcement of all laws involves some discretion.").

[¶144] Chapter 12.1-19.1, N.D.C.C., provides adequate and fair warning to those attempting to comply. The individual terms and the definition as a whole are "understandable to a reasonable person, and provide adequate warning of the conduct prohibited." *Montplaisir*, 2015 ND 237, ¶ 28. We have never held "a criminal statute [is] vague solely because close cases may exist under its requirements. That problem is addressed by requiring proof of a specific

violation beyond a reasonable doubt, not by invalidating the statute for facial vagueness." *Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018). "Many statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.'" *Schwalk*, 430 N.W.2d at 320.

[¶145] The serious health risk exception does not present a clear answer to every imaginable situation. No statute can. This statute provides minimum guidelines to avoid arbitrary and discriminatory enforcement, and also provides fair warning to a reasonable person about what conduct is prohibited.

[¶146] **Sex Offenses Exception.** The Plaintiffs argue the sex offenses exception is unconstitutionally vague because it does not provide fair notice to physicians. Chapter 12.1-19.1 does not apply to "[a]n abortion to terminate a pregnancy that based on reasonable medical judgment resulted from gross sexual imposition, sexual imposition, sexual abuse of a ward, or incest, as those offenses are defined in Chapter 12.1-20, if the probable gestational age of the unborn child is six weeks or less." N.D.C.C. § 12.1-19.1-03(2). They argue a physician is unable by "reasonable medical judgment" or otherwise to determine whether a pregnancy is the result of a sex offense as defined in Chapter 12.1-20. "Reasonable medical judgment" is also a defined term. It "means a medical judgment that would be made by a reasonably prudent physician who is knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved." N.D.C.C. § 12.1-19.1-01(4). As pointed out by the State at oral argument, however, physicians routinely rely on unverified patient self-reports in making medical judgments. We have upheld against vagueness challenge similar definitions. *In re Maedche*, 2010 ND 171, ¶ 16, 788 N.W.2d 331. A vagueness challenge considers fair warning to a reasonable person. The minimum guidelines the statute sets for fair administration is sufficient to curtail arbitrary and discriminatory enforcement. Law enforcement, judges, and juries have sufficient guidance to consider the fact question of whether in a specific enforcement scenario a reasonably prudent physician had such knowledge sufficient to support a reasonable judgment that the pregnancy resulted from a sex offense. Similarly, a physician has fair warning that to satisfy the sex offense exception requires sufficient credible information to satisfy a reasonably prudent physician that a sex offense occurred. While perhaps a more precise formulation

could have been enacted, perfectly precise is not the standard. *Schwalk*, 430 N.W.2d at 320 ("But this prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.'").

IV

[¶147] The district court erred in concluding Chapter 12.1-19.1 is unconstitutionally vague and further erred in concluding N.D. Const. art. I, § 1 protects a right to abortion broad enough to conflict with Chapter 12.1-19.1. Therefore, the judgment of the district court declaring N.D.C.C. ch. 12.1-19.1 unconstitutional on its face should be reversed, without prejudice to any future as-applied challenges.

[¶148]  Jon J. Jensen, C.J.
        Jerod E. Tufte